OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Justine Michael, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

Ramage et al., Appellees, v. Central Ohio Emergency Services, Inc., et al., Appellants.

[Cite as Ramage v. Central Ohio Emergency Serv., Inc. (1992), Ohio St.3d .]

Negligence -- Requirements to establish negligence of a nurse -- Wrongful death -- Pursuant to R.C. 2125.02, other next of kin, although not presumed to have sustained damages, may recover damages for mental anguish and loss of society upon proper proof -- Interrogatories -- Civ. R. 49(B), construed -- Medical malpractice -- Issue of proximate cause -- Motion for directed verdict denied, when -- Evidence -- Party during direct examination of its expert witness may inquire whether expert agrees with opinions expressed in publications by adverse party's expert witness -- Allowance or refusal of leading questions of a witness is within sound discretion of court.

1. In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury.

2. Pursuant to the Ohio wrongful death statute, R.C. 2125.02, other next of kin, although not presumed to have sustained damages, may recover damages for mental anguish and loss of society upon proper proof thereof, even though there is a surviving parent, spouse, or minor children.

3. Although Civ. R. 49(B) mandates that a trial court submit interrogatories to the jury once requested to do so, the court retains limited discretion to reject submission of the interrogatories where the request is untimely or the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable. Proper jury interrogatories must address determinative issues and must be based upon the evidence presented.

4. Where there is competent expert testimony, based on reasonable medical probability, that the negligent acts of a physician were the direct and proximate cause of the patient's death, a trial court correctly denies a motion for directed verdict on the issue of proximate cause.

(Cooper v. Sisters of Charity of Cincinnati, Inc. [1971], 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97; and Strother v. Hutchinson [1981], 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 567, construed and followed.)

5.  A party may, during the direct examination of its expert witness, inquire whether that expert agrees with the opinions expressed in publications by the adverse party's expert witness.

6.  The allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion.  In the absence of an abuse of discretion, the trial court's ruling must stand.  (Seley v. G.D. Searle & Co. [1981], 67 Ohio St.2d 192, 204, 21 O.O.3d 121, 128, 423 N.E.2d 831, 840, followed.)

(Nos. 91-351, 91-370 and 91-371 -- Submitted January 8, 1992 -- Decided June 24, 1992.)

Certified by and Appeal from the Court of Appeals for Guernsey County, Nos. 89-CA-20, 89-CA-43 and 89-CA-49.

This case involves the death of Ashley Ramage, a two-year-old child.  Ashley was the daughter of Richard A. Ramage ("Ramage") and lived with her father at her grandparents' home in Byesville, Ohio.  On the night of February 28, 1987, Ramage left Ashley with neighbors, the McJessys, so that he could socialize with friends.  The McJessys, particularly Jill McJessy, had babysat for Ashley on a number of occasions.

The McJessys picked up Ashley at her grandparents' home at approximately 6:00 p.m. and took her back to their home.  During the evening and when she went to bed at 10:00 p.m., Ashley did not exhibit any signs of being ill.  Ashley slept in Jill's twin bed with her.

At approximately 1:00 a.m., Jill awoke and found Ashley shaking.  Ashley was hot, and, according to Jill, appeared to be having a convulsion.  Jill called her mother, Judy McJessy, who was in her bedroom.  Judy told Jill to undress Ashley while she drew a bath.  Jill and Judy placed Ashley in the bathtub and began to rinse her body off.  They then located Ramage by telephone and, as they prepared to leave for Guernsey Memorial Hospital (the "hospital"), he arrived.  Mr. McJessy then drove his wife, daughter, Ashley and Ramage to the hospital.

Dr. Eugene J. Coles, an employee of appellant Central Ohio Emergency Services, Inc. ("COES"), was the physician on duty in the emergency room when Ashley arrived.  The hospital had a contract with COES whereby COES provided physicians as independent contractors for staffing the hospital's emergency room.  The emergency room was also staffed by Carol Hoskins, a registered nurse, and Anita J. Meker, a licensed practical nurse, both employees of the hospital.

Ramage, Ashley, and the McJessys arrived at the hospital at approximately 1:35 a.m.  At that time, there were no other patients in the emergency room.  Nurse Meker was the first to examine Ashley and to speak with Jill and Judy McJessy.  When Meker asked what was wrong, Jill stated that at around 1:00 a.m., Ashley had had "a temperature" and was having a convulsion, and that Ashley had vomited while at home.  When questioned as to what she meant by the term "convulsion," Jill

indicated it was just like what Ashley was doing in the emergency room -- she was shaking. Meker noted in the medical record that Ashley was having chills and was shaking when Jill made this comment.

As Ashley was brought into the emergency room, she vomited again. Meker described the vomit as a small amount of clear fluid. That observation was disputed by Jill, Judy and Ramage, who remembered that Ashley vomited a large amount of undigested food after she was seated on one of the tables in the emergency room.

Ashley was undressed and placed in a hospital gown. Meker took Ashley's temperature rectally which was recorded as 104.6 degrees. Ashley's pulse was 128, her respiration was 28, and her blood pressure was 90 over 50. Meker examined Ashley for any visible marks or bruises but found none. At approximately 1:45 a.m., pursuant to Dr. Coles' orders, Meker gave Ashley a Tylenol suppository to help reduce her fever.

Ashley was then seen by Dr. Coles, who also took a history from Jill and Judy as well as from Ramage. Dr. Coles examined the child and ordered a complete blood count, chest x-rays, and a strep screen. He examined her ears, throat and torso, but failed to find a cause for the fever. According to Dr. Coles, during his examination, Ashley was alert and her skin was dry, indicating that she was not dehydrated. At that time, it was his impression that Ashley had suffered a simple febrile seizure.

According to Meker, minutes after being given the Tylenol, Ashley's condition began to improve. Ashley appeared to be alert and talkative and, prior to her discharge, wanted to get down from the examining table. Jill, Judy and Ramage, however, each testified that Ashley's physical appearance never changed from the time of her arrival until her discharge.

Dr. Coles reviewed Ashley's chest x-rays and blood tests and found nothing unusual. He examined her a second time and ordered a second set of blood tests. While in the emergency room, Ashley ate two popsicles that the nurses gave her to help with her fever, to give her fluids, and to distract her while blood was being drawn. According to the nurses, after eating the popsicles, Ashley was alert and talkative. Within forty-five minutes after her arrival, her temperature began to decrease. By 2:21 a.m., her temperature was recorded as 103.2 degrees.

Ashley was discharged from the emergency room at 2:50 a.m. Both Dr. Coles and the nurses continued to monitor and observe her prior to her discharge. Her condition had improved, and her temperature had continued to decrease. Neither Dr. Coles nor the nurses recalled any episode of a seizure, other than some "shaking," during this time nor did they recall being told by either Ramage, Jill or Judy of another seizure. Nor, apparently, are additional seizures noted in the medical records. Jill, Judy and Ramage, however, each testified that he saw what appeared to be the start of a second seizure while Ashley was in the emergency room.

By 2:45 a.m., Ashley's temperature was recorded as 101.4 degrees. Dr. Coles diagnosed Ashley as having a flu syndrome and made the decision that Ashley should be allowed to return home with instructions that Ramage monitor her fever. Dr.

Coles instructed Ramage and Jill and Judy to give Ashley plenty of fluids to avoid dehydration as well as Tylenol liquid every four hours to control the fever.

The nurses also gave Ramage further instructions, which included a written instruction sheet that reiterated that Ashley be given plenty of fluids and medications as directed, including one and one-half teaspoons of Tylenol every four hours so long as she continued to show a fever. Ramage was given two prepackaged doses of Tylenol to give to Ashley for the next two four-hour periods.

On the way home from the hospital, the McJessys and Ramage stopped at a store and purchased some fruit juice and additional Tylenol. Once home, Ramage put Ashley to bed immediately.

According to Ramage, he woke Ashley around 4:15 a.m. (approximately forty-five minutes after putting her to bed), and gave her another dosage of Tylenol. When he went to again awaken her between 9:00 a.m. and 9:15 a.m., she was dead in her crib.

On February 18, 1988, Ramage, individually, and as administrator of the estate of Ashley Ramage ("appellee" herein), filed suit against Dr. Coles, COES, and the hospital, alleging that they or their employees or both were negligent in the treatment of Ashley on March 1, 1987 in the emergency room of the hospital. Ramage further alleged that this negligent treatment was the proximate cause of Ashley's death. Ramage sought damages under both survivorship and wrongful death causes of action.

At trial, the court granted the motions of Dr. Coles, COES, and the hospital for a directed verdict on Ramage's survivorship claim. The court also declined to submit interrogatories proposed by the appellants asking the jury to state the manner in which Dr. Coles, COES and the hospital nursing staff were negligent and the manner in which their negligence was the proximate cause of Ashley's death. The court, after initially objecting to the wording of the proposed interrogatories, gave no reason for the denial, despite counsel's attempted amendment of the wording.

On November 20, 1989, the jury returned a verdict in favor of Ramage, finding Dr. Coles to be seventy-five percent liable and the hospital to be twenty-five percent liable. The jury awarded Ramage $750,000 in damages, and judgment was entered upon the verdict against Dr. Coles, COES and the hospital.

The court of appeals affirmed the trial court's judgment. On February 12, 1991, the court of appeals certified the record of the case to this court for final review and determination (case Nos. 91-351 and 91-371), finding its judgment to be in conflict with the decisions of several other appellate districts with regard to the issues of the grandparents' right to recover as next of kin under the wrongful death statute and the trial court's duty to submit requested interrogatories to the jury. This court allowed a motion to certify the record on March 27, 1991 on the remaining issues (case No. 91-370).

Wolske & Blue, Gerald S. Leeseberg and Michael S. Miller, for appellees.

Jacobson, Maynard, Tuschman & Kalur, Karen L. Clouse,

Daniel J. White and Richard W. Stuhr, for appellants Central Ohio Emergency Services, Inc. and Eugene J. Coles, M.D.

Bricker & Eckler, Michael J. Renner, Charles D. Smith and Catherine Ballard, for appellant Guernsey Memorial Hospital.

Jones, Day, Reavis & Pogue, Michael K. Gire and Richard A. Cordray, urging reversal for amicus curiae, Ohio Hospital Association.

Moyer, C.J.    Appellants, Central Ohio Emergency Services, Inc. and Eugene J. Coles, M.D., assert four propositions of law, and appellant Guernsey Memorial Hospital argues seven propositions of law, which effectively present seven issues for our consideration. For the following reasons, the judgment of the court of appeals is affirmed in part and reversed in part.

I

In its first two propositions of law, the hospital asserts that the court of appeals erred in finding that expert testimony was unnecessary to establish the prevailing standard of care, a breach of the standard by the emergency room nurses, and that the alleged breach was a proximate cause of the decedent's injury. We agree.

Unless a matter is within the comprehension of a layperson, expert testimony is necessary. Evid. R. 702 and 703. Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinion regarding the facts. McKay Machine Co. v. Rodman (1967), 11 Ohio St.2d 77, 40 O.O.2d 87, 228 N.E.2d 304.

It is well settled in Ohio that in order to prevail in a medical malpractice claim, a plaintiff must demonstrate through expert testimony that, among other things, the treatment provided did not meet the prevailing standard of care.

"Proof of the recognized standards must necessarily be provided through expert testimony. This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence." Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 131-132, 75 O.O.2d 184, 187, 346 N.E.2d 673, 677-678.

Although this court has previously held that an action filed against a nurse in his or her professional capacity does not fall within the traditional definition of "malpractice," Richardson v. Doe (1964), 176 Ohio St. 370, 27 O.O.2d 345, 199 N.E.2d 878, we conclude that expert testimony is necessary to establish the prevailing standard of care where the professional skills and judgment of a nurse are alleged to be deficient. Ohio courts have long recognized this principle.

"Where the issue is one of an exercise of judgment or skill requiring the specialized training of a nurse, expert-opinion evidence would be required." Johnson v. Grant Hosp. (1972), 31 Ohio App.2d 118, 124-125, 60 O.O.2d 202, 205, 286 N.E.2d 308, 313, reversed on other grounds (1972), 32 Ohio St.2d 169, 61 O.O.2d 413, 291 N.E.2d 440. See, also, Albain v. Flower Hosp. (1990), 50 Ohio St.3d 251, 553 N.E.2d 1038; and Hundemer v. Sisters of Charity (1969), 22 Ohio App.2d 119, 51 O.O.2d 243, 258 N.E.2d 611.

Ramage asserts that this case falls within the "common knowledge exception." Under this exception, matters of common knowledge and experience, subjects which are within the ordinary, common and general knowledge and experience of mankind, need not be established by expert opinion testimony. Johnson v. Grant Hosp., supra. Ramage argues that the alleged negligence of the nurses in this case occurred merely in their observation and reporting of the decedent's condition to the doctor and that this involves matters within the common knowledge and experience of the jurors.

In support, Ramage cites several Ohio cases involving allegations of nursing negligence in which it was held that expert opinion testimony was unnecessary to establish the standard of care and a breach thereof. Jones v. Hawkes Hosp. of Mt. Carmel (1964), 175 Ohio St. 503, 26 O.O.2d 170, 196 N.E.2d 592; Burks v. Christ Hosp. (1969), 19 Ohio St.2d 128, 48 O.O.2d 117, 249 N.E.2d 829. However, Jones and Burks involved allegations of negligence with regard to patients who fell from their hospital beds while unattended. Such allegations were claims of ordinary negligence. The allegations in this case go to the professional skill and judgment of the nurses -- matters not within the common knowledge and experience of the jurors.

In his complaint, Ramage alleged that "Defendants, Central Ohio Emergency Services, Inc., and Guernsey Memorial Hospital, by and through their agents or employees, actual or ostensible, Defendant, Eugene J. Coles, M.D., and John Doe, M.D., and John Doe, Inc., were professionally negligent and did fall below the standard of care of ordinarily careful, skillful and prudent physicians and other health care professionals in that they failed to properly diagnose, treat and care for Plaintiff's decedent's true medical condition." (Emphasis added.) Further, "[a]s a direct and proximate result of the negligence of the Defendants, Plaintiff's decedent suffered bodily injury and experienced pain, suffering and mental anguish." Moreover, the testimony at trial concerned the treatment and care the decedent received from the team of health-care professionals, including the nurses, in the emergency room -- matters not within the common knowledge and experience of jurors.

As any negligence of the nurses in this matter and proximate causation were not apparent to a layperson, expert testimony was needed to establish the nurses' negligence, if any, and to establish that their negligence, if any, was the proximate cause of Ashley's injury. Where the alleged negligence involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury. Therefore, we reverse the judgment of the court of appeals with respect to its conclusion that expert testimony regarding the standard of care required of the emergency room nurses, a breach thereof, and its proximate causation of Ashley's injury was unnecessary.

II

Next, the hospital, COES and Dr. Coles argue that the judgment of the court below should be reversed because the jury was permitted to consider evidence of the "mental anguish" and

"loss of society" of Richard and Janet Ramage, Ashley's grandparents. Recovery by such persons, they contend, is precluded as a matter of law under R.C. 2125.02, the Ohio wrongful death statute. R.C. 2125.02 provides, in part:

"(A)(1) An action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent.

"***

"(B) Compensatory damages may be awarded in an action for wrongful death and may include damages for the following:

"***

"(3) Loss of the society of the decedent, including loss of companionship *** suffered by the surviving spouse, minor children, parents, or next of kin;

"***

"(5) The mental anguish incurred by the surviving spouse, minor children, parents, or next of kin."

Appellants cite an appellate court decision which has interpreted R.C. 2125.02 to permit recovery by other next of kin under the statute only where the decedent is not survived by a spouse, parent, or children. See Bennett, Admx. v. Cleveland (June 5, 1986), Cuyahoga App. No. 50479, unreported. See, also, Molton v. Cleveland (C.A.6, 1988), 839 F.2d 240; and Urseth v. Dayton (S.D.Ohio 1987), 680 F.Supp. 1150. Appellants also cite the leading treatise in this area of the law, McCormac, Wrongful Death in Ohio (1989 Supp.), Section 2.07. However, Judge McCormac has recently taken the view that next of kin other than the surviving parent, spouse, or minor child of the decedent may recover damages for mental anguish, even if there is a surviving parent, spouse, or minor child. Shoemaker v. Crawford (Dec. 24, 1991), Franklin App. No. 91AP-358, unreported, 1991 WL 274886, motion and cross-motion to certify record allowed in (1992), 63 Ohio St.3d 1473,      N.E.2d    .

In response, Ramage cites a number of appellate court decisions which have concluded that other next of kin may recover under R.C. 2125.02 even though there is a surviving parent, spouse, or minor children. In re Estate of Forbes (Aug. 25, 1988), Cuyahoga App. No. 54226, unreported; 1988 WL 88853; Parker v. Bd. of Edn. of Sylvania City School Dist. (Mar. 11, 1988), Lucas App. No. L-87-028, unreported; 1988 WL 30518; and Shoemaker, supra.

Appellants focus on the language of R.C. 2125.02(B)(3) and (5). Specifically, they note that the use of the disjunctive word "or" in both subsections of the statute indicates that next of kin may recover only if the decedent is not survived by a parent, spouse, or children. We disagree. R.C. 1.02(F) permits "or" to be read as "and" if appropriate. An examination of the purposes behind the wrongful death statute reveals that it is appropriate here.

This court has held that the wrongful death statute is "remedial in nature, and should be construed liberally." Kyes v. Penn RR. Co. (1952), 158 Ohio St. 362, 49 O.O.2d 239, 109 N.E.2d 503, paragraph two of the syllabus. See, also, French

v. Dwiggens (1984), 9 Ohio St.3d 32, 9 OBR 123, 458 N.E.2d 827, syllabus ("R.C. 2125.02, as amended, effective February 5, 1982, is remedial in nature as written and promulgated by the General Assembly, and applies to all wrongful death actions tried in any forum on or after that date."). Under R.C. 1.11, laws which are remedial in nature must be liberally construed to promote their purposes. See Lawson v. Atwood (1989), 42 Ohio St.3d 69, 72, 536 N.E.2d 1167, 1169; and Barton v. DePew (1988), 47 Ohio App.3d 107, 109, 547 N.E.2d 995, 996.

We believe that the General Assembly intended that in addition to the surviving parent, spouse, and minor children, brothers, sisters, adult children and other next of kin may also recover for the mental anguish suffered as a result of the death of their loved one. In R.C. 2125.02, the General Assembly recognized that the bonds such persons may enjoy with the decedent may be different from those of the surviving parent, spouse, and minor children, and so provided that other next of kin are not presumed to have suffered damages but must instead prove their damages. We cannot agree with appellants that the General Assembly intended to exclude next of kin simply because another category of survivors exists. To hold otherwise would be contrary to the remedial purposes of the statute. Thus, we hold that under R.C. 2125.02, other next of kin, although not presumed to have sustained damages, may recover damages for mental anguish and loss of services upon proper proof thereof, even though there may be a surviving parent, spouse, or minor children. We, therefore, affirm the judgment of the court of appeals that R.C. 2125.02 did not preclude Ashley's grandparents from testifying concerning, or recovering for, their mental anguish and loss of society resulting from Ashley's death.

III

The appellants next contend that the trial court committed reversible error by failing to submit certain requested defense interrogatories to the jury. We disagree.

The trial court refused to submit the following interrogatories requested by the hospital:

"JURY INTERROGATORY NO. 3

"Do you find, by a preponderance of the evidence, that Dr. Coles was an employee or agent of Guernsey Memorial Hospital at the time he treated Ashley Ramage?"

"JURY INTERROGATORY NO. 4

"Do you find, by a preponderance of the evidence, that Mr. Ramage or the McJessy's [sic] would have taken any different course of action on March 1, 1987, had they known that Dr. Coles was not an agent or employee of Guernsey Memorial Hospital?"

COES and Dr. Coles requested that the following jury interrogatories be submitted, but the court declined to do so.

"JURY INTERROGATORY NO. 2

"2. State below specifically the manner in which Defendants Central Ohio Emergency Services, Inc. and Eugene J. Coles, M.D. were negligent in their care and treatment of Plaintiff's decedent, Ashley D. Ramage."

"JURY INTERROGATORY NO. 4

"4. Please state below specifically the manner in which Defendants Central Ohio Emergency Services, Inc. and Eugene J.

Coles, M.D.'s negligence was a proximate cause of the death of Plaintiff's decedent, Ashley D. Ramage."

"JURY INTERROGATORY NO. 5

"5.  Do you find, by a greater weight of the evidence, that Rick Ramage suffered any damages caused by the death of Plaintiff's decedent, Ashley D. Ramage, and which were proximately caused by the negligence of Defendants Central Ohio Emergency Services, Inc. and Eugene J. Coles, M.D.?"

"JURY INTERROGATORY NO. 6

"6.  Please state below the total amount of damages you find that Rick Ramage suffered which were proximately caused by the negligence of Defendants Central Ohio Emergency Services, Inc. and Eugene J. Coles, M.D."

Civ. R. 49(B), which governs the use of jury interrogatories, provides in part:

"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument.  Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time.  The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact or law.

"The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict."

Jury interrogatories serve an important function.  "*** The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial."  Cincinnati Riverfront Coliseum, Inc. v. McNulty Co. (1986), 28 Ohio St.3d 333, 336-337, 28 OBR 400, 402-403, 504 N.E.2d 415, 418.  However, the disputed interrogatories in this case do not serve that function.

Although Civ. R. 49(B) mandates that a trial court submit interrogatories to the jury once requested to do so, the court retains limited discretion to reject submission of the interrogatories where the request is untimely or the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable.  Proper jury interrogatories must address determinative issues and must be based upon trial evidence.  As this court has stated, Civ. R. 49(B) does not require that the "'*** trial judge [act as] a mere conduit who must submit all interrogatories counsel may propose.  Authority is still vested in the judge to control the substance and form of the questions, and if the interrogatories are not based on the evidence, are incomplete, ambiguous or otherwise legally objectionable, the judge need not submit them to the jury.'" Ragone v. Vitali & Beltrami, Jr., Inc. (1975), 42 Ohio St.2d 161, 165-166, 71 O.O.2d 164, 166, 327 N.E.2d 645, 649, citing the decision of the court below in that case.

In the present case, the trial court properly exercised judicial discretion in not submitting the disputed jury interrogatories, as they were inappropriate. The third and fourth interrogatories submitted by the hospital did not go to determinative issues in the case. Ramage's claim against the hospital was with respect to the alleged negligence of the nurses, who were employees of the hospital. Ramage did not contend, and the evidence adduced at trial did not indicate, that Dr. Coles was an employee of the hospital. Thus, interrogatory No. 3 was irrelevant and unnecessary. Similarly, interrogatory No. 4 did not go to a determinative issue.

Appellants COES and Dr. Coles argue that the trial court erred in failing to submit their proposed second and fourth interrogatories. Only one act of negligence was alleged against COES and Dr. Coles, i.e., failure to admit Ashley to the hospital for further care and treatment. Thus, these proposed interrogatories were unnecessary. Where the determinative issues and the issues submitted to the jury for its verdict are identical, there is no function for an interrogatory. Richley v. Liechty (1975), 44 Ohio App.2d 359, 363, 73 O.O.2d 408, 410, 338 N.E.2d 789, 792. COES and Dr. Coles do not argue that the court's failure to submit the fifth and sixth interrogatories requested by them was error.

As the trial court did not err as a matter of law or abuse its discretion in refusing to submit to the jury these proposed interrogatories, we affirm the judgment of the court of appeals that the trial court properly refused to submit them to the jury.

IV

Appellants COES and Dr. Coles contend that the trial court also erred in permitting Ramage's expert witness to testify that Ashley suffered from a small bowel obstruction at the time of her death, and that by doing so the court permitted Ramage to present a new theory of liability not revealed in discovery. At trial, Ramage's counsel asked his expert, Dr. John Bomalaski, to read Ashley's chest x-rays taken at the hospital. Dr. Bomalaski had not seen the x-rays prior to trial and counsel for all the appellants objected to any testimony regarding the x-rays. The court sustained the objection in part and permitted Ramage's counsel only to ask Dr. Bomalaski whether the information contained in the x-rays was consistent with his opinion that Ashley should not have been discharged from the emergency room. Thus, there was only a passing reference to the putative bowel obstruction. The court did not permit Ramage to present evidence that Dr. Coles breached any standard of care with regard to the bowel obstruction. No new theory of liability was presented to the jury. Thus, the trial court did not err with respect to the passing reference to a small bowel obstruction.

V

Appellants COES and Dr. Coles also assert that the trial court erred in failing to grant their motion for a directed verdict on the issue of proximate cause. The strict standard for granting a directed verdict is found in Civ. R. 50(A)(4):

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is

directed, finds that upon any determinative issue that reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion ***."

In Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178-179, 423 N.E.2d 467, 469, this court explained this standard:

"When considering a motion for a directed verdict, a trial court must construe the evidence most strongly in favor of the party against whom the motion is directed. ***

"***

"The law in Ohio regarding directed verdicts is well formulated. *** Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. Kellerman v. J.S. Durig Co. (1964), 176 Ohio St. 320 [27 O.O.2d 241, 199 N.E.2d 562] ***.' Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 115 [4 O.O.3d 243, 244, 363 N.E.2d 367, 368]."

Our review of the record indicates that there was substantial competent evidence on which reasonable minds could differ. Ramage's expert testified that Dr. Coles was negligent in failing to admit Ashley for further care and treatment and that this failure was the proximate cause of her death. Appellants COES and Dr. Coles argue that this expert testimony was contradicted on cross-examination. We fail to see such a contradiction. On cross-examination, the expert was asked several hypothetical questions so different from the facts in this case that any apparent contradiction is insignificant. The trial court properly denied the motion for a directed verdict, and the court of appeals properly affirmed that decision.

We, therefore, hold that where there is competent expert testimony, based on reasonable medical probability, that the negligent acts of a physician were the direct and proximate cause of the patient's death, a trial court correctly denies a motion for directed verdict on the issue of proximate cause. Cooper v. Sisters of Charity of Cincinnati, Inc. (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97; Strother v. Hutchinson, supra.

VI

The appellant hospital next asserts that the trial court erred in permitting Ramage's counsel to inquire during the direct examination of its expert witness as to whether he agreed with the opinions of the hospital's potential expert witness, Dr. Douglas A. Rund, found in a book written by that expert. Unlike the evidentiary rules of the federal courts, the Ohio Rules of Evidence do not provide for the learned treatise exception to the hearsay rule. In Ohio, textbooks and other learned treatises are considered hearsay, may not be used as substantive evidence, and are specifically limited to impeachment purposes only. Giannelli, Ohio Evidence Manual (1989), Section 702.06, Author's Comment; Piotrowski v. Corey Hosp. (1961), 172 Ohio St. 61, 15 O.O.2d 126, 173 N.E.2d 355; Lambert v. Dally (1972), 30 Ohio App.2d 36, 59 O.O.2d 29, 281 N.E.2d 857; Hallworth v. Republic Steel Corp. (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690.

Significantly, although Ramage's expert did not express an opinion concerning the actions of the nurses -- the claim against the hospital -- the hospital asserts this as error. Ramage's expert, Dr. John Bomalaski, testified solely as to the standard of care with respect to the emergency room physician, Dr. Coles. Dr. Bomalaski's testimony did not reach the standard of care of the nurses. Further, the passage from Dr. Rund's book was not used as substantive evidence. The passage was used only in anticipation of the live testimony of Dr. Rund. In fact, Dr. Rund had been asked about the passage in his deposition filed by Ramage with the court prior to trial. However, COES and Dr. Coles chose not to call Dr. Rund to testify at trial. The quotation from Dr. Rund's book was proper in the direct examination of Dr. Bomalaski as it was not used as substantive evidence. We, therefore, hold that a party may, during the direct examination of its expert witness, inquire whether that expert agrees with the opinions expressed in publications by the adverse party's expert witness.

VII

Finally, the appellant hospital argues that the trial court's judgment must be reversed because it was not permitted to question its own witness, JoEllen McCance, as if on cross-examination. The hospital argues in the alternative that McCance was a hostile witness or was closely identified with Ramage and, therefore, it should have been permitted to ask her leading questions. McCance is Ramage's sister and also is employed by the hospital as a nurse.

As this court has stated: "'The allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion.'" Seley v. G.D. Searle & Co. (1981), 67 Ohio St.2d 192, 204, 21 O.O.3d 121, 128, 423 N.E.2d 831, 840, citing Evans v. State (1873), 24 Ohio St. 458, 462; and State v. Wallen (1969), 21 Ohio App.2d 27, 36, 50 O.O.2d 50, 55, 254 N.E.2d 716, 722.

Unquestionably, the plaintiff's sister, McCance, was identified with him. However, she also was an employee of the hospital. Our review of the record reveals nothing which would cause us to believe that she could have been questioned more effectively had the trial court permitted the hospital to use leading questions during its direct examination of her. McCance was generally cooperative when answering the questions asked by the hospital's counsel. Further, the trial court indicated that it would reconsider its ruling regarding the right to cross-examine upon the establishment of hostility by the hospital. The hospital did not request reconsideration nor did it demonstrate hostility on the part of McCance. Moreover, as the court of appeals noted, the hospital had ample opportunity to impeach McCance. In fact, the hospital was able to elicit McCance's admission that her trial testimony regarding the care and treatment given Ashley by the emergency room nurses differed from the testimony given at her deposition. Thus, we find no abuse of discretion on the part of the trial court with regard to its refusal to allow McCance to be questioned by the hospital in a leading manner. In the absence of an abuse of discretion, the trial court's ruling must stand.

Accordingly, for the foregoing reasons, the judgment of the court of appeals is affirmed with regard to COES and Dr. Coles, and reversed and remanded to the trial court for a new trial at the option of Ramage with regard to the liability, if any, of the hospital.  If Ramage chooses not to proceed further, then COES and Dr. Coles could proceed in accordance with the procedures set forth in R.C. 2307.31 and, in particular, R.C. 2307.31(G).

Judgment affirmed in part,
reversed in part
and cause remanded.

Sweeney, Holmes, Wright and H. Brown, JJ., concur.

Douglas and Resnick, JJ., concur in part and dissent in part.

Alice Robie Resnick, J., concurring in part and dissenting in part.  I concur with the majority's construction of R.C. 2125.02, and so concur with the second paragraph of the syllabus.  However, I agree with the court of appeals that there was no need for the jury to hear expert testimony on the standard of care required of the nurses in the circumstances of this case.  For that reason, I would not remand this cause to the trial court, but would affirm the judgment of the court of appeals in toto.

Although I accept the statement of law contained in paragraph one of the syllabus in the abstract, that law has no application to the specific facts of this case; therefore, I dissent in part.  Paragraph one of the syllabus begins by stating:  "In a negligence action involving the professional skill and judgment of a nurse ***."  The problem with the majority's approach is that the professional skill and judgment of a nurse are not really at issue in this case.

The trial court did not require Ramage to present expert testimony to explain the nurses' actions.  On appeal, the court of appeals held that "plaintiff Ramage was not bound to present expert opinion on routine nursing care, i.e., simple observation of a patient."  The appellate court then specifically cited Jones v. Hawkes Hosp. of Mt. Carmel (1964), 175 Ohio St. 503, 26 O.O.2d 170, 196 N.E.2d 592.  The majority, however, chooses to distinguish Jones, as well as Burks v. Christ Hosp. (1969), 19 Ohio St.2d 128, 48 O.O.2d 117, 249 N.E.2d 829, and finds that the "common knowledge exception" does not apply.

The majority states that what is really at issue is "the professional skill and judgment of the nurses -- matters not within the common knowledge and experience of the jurors."  However, the principal thrust of Ramage's argument at trial in this regard was that the nurses were negligent in reporting their observations of Ashley Ramage's vomiting and seizures.  Surely, questions going to whether those observations were adequately relayed to the treating physician do not involve subjects beyond the comprehension of ordinary jurors.  Those are questions readily resolved without the presentation of expert testimony.

I fundamentally disagree with the majority's interpretation of the facts of this case, and I would find Jones and Burks controlling.  While many situations conceivably may arise requiring that expert testimony be presented to establish the negligence of a nurse, this is not one of those

situations.

Douglas, J., concurs in the foregoing opinion.