OPINION
This is an appeal from the Lake County Court of Common Pleas. Appellant, Joseph P. Goldberg, appeals the trial court's judgment entry granting remittitur in favor of appellee, Board of Trustees of Lake Hospital Systems, Inc.
Appellant has a long history of holding executive positions within the medical community. For instance, from 1984 to 1988, appellant was employed in an executive capacity at Lake Hospital in Lake County, Ohio. He also had been a member of the medical staff of Lake Hospital from 1969 to 1984. In 1988, he left Lake Hospital for an executive administration position at Ohio Permanente, while remaining to serve as one of Lake Hospital's trustees until 1992. From 1992 until April 8, 1997, appellant was employed by Kaiser Permanente of Kansas City as its Medical Director.
In 1994, Ralph Sorrell ("Sorrell"), the Chief Executive Officer of Lake Hospital, requested appellant to consider the position of Vice President of Medical Affairs at Lake Hospital, which appellant rejected. The position was then filled by Dr. Albert Bringardner ("Bringardner"), until his retirement in March 1997.
In May 1996, Kaiser Permanente of Kansas City renewed appellant's contract for an additional five years, with an annual salary of $265,637. In the fall of 1996, Bringardner related to Sorrell his intent to retire in March 1997. In a telephone conversation in December 1996, Sorrell extended an offer of employment to appellant for the position of Senior Vice President of Medical Affairs at Lake Hospital. In a subsequent telephone conversation in December with Sorrell, appellant accepted the offer of employment. The salary for the position was discussed as ranging from $150,000 to $218,000. The record indicates that although the compensation at Lake Hospital would be less than that at Kaiser Permanente, appellant was interested in that position because he had grown up in Northeast Ohio and had family members and friends in the local communities. However, no letter confirming that the job had been extended to appellant was ever made.
In the early part of January 1997, appellant gave Kaiser Permanente his ninety-day notice of his intent to resign. During that same month, appellant's successor was named. As a result of the intent to move, appellant also resigned from the various professional and social organizations in which he was involved. Appellant further put his house on the market and made trips to Lake County in order to find suitable housing. Lake Hospital provided him with a written form for his selection of moving van companies for which it would reimburse all moving expenses. Lake Hospital sent appellant information concerning his benefits package. In March 1997, appellant closed a deal on a house in Mentor, Ohio. Finally, in April 1997, appellant's residence in Kansas was sold.
While working on moving to Ohio, on March 4, 1997, appellant learned that Sorrell had been fired. On March 5, 1997, the firing of Sorrell was confirmed by Lake Hospital. In speaking with interim Chief Executive Officer Cynthia Moore-Hardy ("Cynthia") on March 6, 1997, and March 14, 1997, appellant learned that she had no knowledge of any job offer having been extended to him. Cynthia indicated that she would investigate the situation and inform appellant of her findings.
On March 28, 1997, after still not having heard back from Cynthia, despite attempts to contact her, appellant contracted with a moving company to move his goods to Ohio. On April 10, 1997, appellant began his move from Kansas to Ohio. After moving to Ohio, appellant never started work at Lake Hospital. Thus, he had to perform a job search.
In early April, appellant was offered a position with Blue Cross of Kansas City as Director of the Medical Group to begin in June 1997. Appellant eventually accepted the offer, sold his home in Ohio, and moved back to Kansas City. Appellant's income at Blue Cross for 1997 and 1998 was $195,000 per year. He also earned a bonus of $40,000 for 1997, which was paid partly in 1997 and the rest in 1998. Blue Cross provided a pension plan; however, there was a five-year vesting period.
Due to the fact that Blue Cross was going to restructure itself, leaving appellant with lesser duties, appellant began another job search and speculated at the time the instant matter was instituted in the trial court, that he would end his employment by the end of 1999. At the time of trial, appellant anticipated receiving employment from the University of Kansas Medical Center in an executive administrative capacity. The starting salary would be approximately $175,000.
The record demonstrates that appellant filed a complaint against appellee on October 27, 1997. The matter was submitted to the jury on the issues of breach of an oral contract and/or promissory estoppel. Appellant's equitable estoppel and intentional infliction of severe emotional distress claims were dismissed upon motion. At the conclusion of the trial, the jury returned a verdict for appellant in the amount of $325,000.
Appellee filed a motion for new trial, which the trial court indicated it would grant in its judgment entry dated December 21, 1998, if appellant refused to consent to remittitur in the sum of $243,003.30. As a basis for the remittitur, the trial court noted that the "disparity between the Permanente and the Lake Hospital System salaries could not be relied upon as the [appellant] voluntarily agreed to any and all reductions." The lower court further reasoned that appellant "promptly and successfully mitigated his damages." Presumably, the court found mitigation by virtue of the fact that appellant secured work in June 1997 at Blue Cross of Kansas City. Lastly, the court reasoned that the "jury may have weighed the damage evidence presented in support of the emotional distress claim [for making such a high award], which was removed from its consideration."
Appellant now timely appeals the trial court's judgment entry, raising the following assignment of error:
 "The trial court erred when it granted either remittitur or a new trial on the basis that the jury's verdict in the amount of three hundred twenty-five thousand dollars ($325,000.00) was excessive, when the record clearly establishes that [appellant] suffered damages exceeding $600,000.00, despite reasonable efforts by [appellant] to mitigate, as a result of lost salary, lost pension, and transactional expenses owing to the liability of [appellee], which losses and expenses were well beyond the amount awarded. Memorandum and Judgment Entry, Docket No. 134."
Appellee timely filed its cross-appeal within the ten-day rule set forth in App.R. 4(B)(1), raising the following as error:
 "[1.] The trial court erred when it refused to give to the jury interrogatories timely submitted by [appellee], the form and content of which properly related to the facts admitted into evidence and the factual disputes that the jury had to decided [sic], which interrogatories would have provided an effective means for testing the jury's verdict.
 "[2.] The trial court erred when it refused to give to the jury [appellee's] propose [sic] instructions on oral contract, which stated that for an enforceable contract to exist the parties must have a meeting of the minds as to the essential terms of the agreement.
 "[3.] The trial court erred when it refused to give the jury [appellee's] propose [sic] instructions on promissory estoppel, which stated that to create a [sic] obligation to provide employment by promissory estoppel, a clear and unambiguous promise of employment must exist."
 As appellee's first assignment of error in its cross-appeal is dispositive of the instant matter currently before this Court, we will address that assignment first.
In that assignment of error, appellee contends that on November 2, 1998, prior to the commencement of closing argument, it submitted nine proposed interrogatories to the jury. Moreover, appellee claims that the trial court's refusal to submit the interrogatories to the jury solely on the basis of their alleged tardiness, when in fact they were not submitted late, constitutes reversible error, mandating a new trial. Additionally, appellee indicates that the interrogatories addressed determinative issues in controversy as evidenced by the trial court's statement in its December 21, 1998 judgment entry ordering remittitur or a new trial: "[s]ince the [c]ourt did not permit the numerous, late-filed interrogatories, there is no test for the jury verdict."
Interrogatories are governed by Civ.R. 49, which states:
 "(B) General verdict accompanied by answer to interrogatories. The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.
The Ohio Supreme Court has repeatedly held that a trial court has a mandatory duty to submit proper written interrogatories to the jury upon the request of any party. Ramage v. Central OhioEmergency Serv., Inc., (1992), 64 Ohio St.3d 97, paragraph three of the syllabus; Riley v. Cincinnati (1976),46 Ohio St.2d 287, 297-298; Ragone v. Vitali Beltrami, Jr.,Inc., (1975), 42 Ohio St.2d 161, paragraph one of the syllabus. Yet, Civ.R. 49(B) does not "render the trial judge a mere conduit who must submit all interrogatories counsel may propose." Ragone, 42 Ohio St.2d at 165. Indeed, the trial court "retains limited discretion to reject submission of the interrogatories where the request is untimely or the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable." Ramage, 64 Ohio St.3d at paragraph three of the syllabus; see, also, Riley, 46 Ohio St.2d at 298;Ragone, 42 Ohio St.2d at 165-166. Submission of interrogatories prior to closing arguments is timely under Civ.R. 49(B). West v.Vajdi (1987), 39 Ohio App.3d 60, 60, 62. Proper jury interrogatories are those that address determinative issues and which are based upon the evidence presented. Ramage, 64 Ohio St.3d at paragraph three of the syllabus.
In the case sub judice, the trial court did not prohibit appellee's interrogatories from going to the jury because they were ambiguous, confusing, redundant, or otherwise legally objectionable; but rather, because they were untimely filed. Indeed, the trial court undertook no analysis of the proposed interrogatories as to form or substance. In fact, in its December 21, 1998 judgment entry, the trial court indicates that the interrogatories concerned determinative issues when it stated that, "[s]ince the [c]ourt did not permit the numerous, late-filed interrogatories, there is no test for the jury verdict."
Moreover, the record reveals that appellee's interrogatories were submitted timely pursuant to Civ.R. 49(B), as evidenced by the stipulation filed on August 18, 1999. In that document, both parties stipulated that appellee's nine interrogatories were submitted on the morning of November 2, 1998, prior to the commencement of closing arguments. Under the law set forth in Civ.R. 49(B) and Vajdi, the submission of interrogatories prior to the commencement of closing arguments is timely. Thus, the trial court's refusal to submit the interrogatories to the jury because it believed them to be untimely, was in error. Consequently, appellee's first assignment of error in its cross-appeal is well-taken.
Due to the resolution of appellee's first assignment of error in its cross-appeal, appellant's assignment of error and appellee's remaining cross assignments are rendered moot.
For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is reversed, and the matter is remanded for a new trial on the issues of liability and damages. In arriving at this holding, we acknowledge that this case presented difficult issues for the trial court to resolve. The trial court itself recognized that the failure to submit interrogatories to the jury interfered with the ability to test the validity of the general verdict in dispute in this case.
A new trial is necessary in light of the problems a jury would have in dealing in a bifurcated manner with the issue of damages without the unfettered ability to determine whether the measure of damages should arise from promissory estoppel or breach of contract, in the event that there was a factual finding in favor of appellant on the issue of liability.
 _______________________________ DONALD R. FORD, PRESIDING JUDGE
NADER, J. O'NEILL, J., concur.