JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff, David W. Hager, II is the administrator of the estate of his father, decedent, Harry Hager. Plaintiff appeals the trial court granting defendant Fairview Park Hospital's motion for directed verdict at the conclusion of plaintiff's case during trial. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} In December 2000, decedent was admitted to Fairview to be treated for severe dementia and foot ulcers. On January 15, 2001, decedent was scheduled for foot surgery. While being prepped for surgery, plaintiff saw two nurses attempting to remove his father's dentures. Plaintiff advised the nurses that his father did not have dentures that could be removed.
 {¶ 3} Two days after the surgery, plaintiff saw his father and discovered his teeth were cracked and hanging down in his mouth. As he recuperated from his foot surgery, decedent had difficulty eating. Decedent died in May 2001.
 {¶ 4} Plaintiff sued defendant for its nurses' negligence in attempting to remove his father's teeth. The case proceeded to trial and at the end of plaintiff's case, the trial court granted defendant's motion for directed verdict. Plaintiff filed this timely appeal and assigns one error for review:
 {¶ 5} The trial court committed reversible error in granting defendant's motion for a directed verdict at the close of plaintiff's case.
 {¶ 6} Plaintiff argues that he presented sufficient evidence of defendant's negligence to withstand a motion for directed verdict.
 {¶ 7} Civ.R. 50(A)(4) sets forth the standard for ruling on a motion for a directed verdict. It states:
 {¶ 8} When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
 {¶ 9} "A motion for a directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence."Texler v. D.O. Summers Cleaners (1998), 81 Ohio St.3d 677,679-680, 1998-Ohio-602, 693 N.E.2d 271, citing Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68-69,430 N.E.2d 935, 938. In deciding the merits of a motion for directed verdict, the trial court does not weigh the evidence or evaluate the credibility of witnesses. Id. Instead, the court construes the evidence in a light most favorable to the party opposing the motion, and "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." (Citations omitted.) Texler, supra., at 679.
 {¶ 10} In the case at bar, plaintiff presented nurse Sharon Martino, RN, an expert on the standard of care for removing a patient's dentures. Martino's testimony about the prevailing standard of care for removing a patient's dentures prior to surgery, however, is not at issue.[1] The central question is whether the court erred in prohibiting Martino from testifying as to the cause of decedent's injuries. We think not.
 {¶ 11} There are two issues in this case: whether the nurses' actions constituted a breach of their duty of care and whether that breach was the proximate cause of decedent's loose teeth. This case fails on both issues.
 {¶ 12} Before a breach of duty can be established, the facts must be clearly established as to what the nurses did. Plaintiff never called the nurses to testify. The only evidence in the record of what the nurses did is that provided by the son, who testified as follows:
 {¶ 13} Q: All right. You went to the waiting room?
 {¶ 14} A: Yes.
 {¶ 15} Q: Could you tell the jury what happened next?
 {¶ 16} A: It was probably about within five, ten minutes. It was pretty quick. We were drinking a cup of coffee, sitting in there, and the nurse had come in there and said, "Mr. Hager, I need you to come along with me. We can't get your father's dentures out." And I replied to her, "my father doesn't have dentures." And she said, "he doesn't have dentures. Whatever he's got, they don't come out. They're permanent." She said, "well, we need to sign papers."
 {¶ 17} Q: What happened next?
 {¶ 18} A: I accompanied her to the surgery prep area, I guess it would be called.
 {¶ 19} Q: What, if anything, did you observe there?
 {¶ 20} A: As we walked in, probably about 15 feet away, maybe 20, directly across from the room was the gurney my father was on and there was two people standing above him. One of them seemed to have ahold [sic] of his shoulder and the other one seemed to be tugging at his mouth. And I said "his teeth do not come out."
 {¶ 21} Q: And at that point when you said that what happened?
 {¶ 22} A: They stopped. I didn't think no more of it. And I walked with the nurse right around the corner and signed the papers.
 {¶ 23} Q: Now, at the time that you walked in and you saw the nurses standing over your father, what, if any, noises did you hear coming from your father?
 {¶ 24} A: He was grunting.
 {¶ 25} Q: Anything beside grunting?
 {¶ 26} A: Just moaning and grunting.
 {¶ 27} Tr. 219-220.
 {¶ 28} First, the record does not establish how much force was used in this "tugging," that is, whether it was gentle or violent. The son admitted he was 15 to 20 feet away and the nurse was between him and the decedent. Thus he was not in a position to describe the degree of force the nurse used. Nor can one infer from the decedent's sounds what force was used, because decedent had dementia. The sounds, moreover, could have been caused by any number of factors, for example, having to keep his mouth open longer than was comfortable or simply not wanting to keep his mouth open at all. Nor does the record indicate how long the nurse had been attempting to remove the dentures. She may have just begun.
 {¶ 29} That she stopped when the son came and spoke does not establish she did not independently see a problem and was about to stop to evaluate. The sketchy facts as to what occurred provide little basis for Martino to form an opinion on whether there was a breach of duty.
 {¶ 30} A second problem with the facts here is the lapse of time between the nurse's attempt to remove the dentures and the observation that decedent's teeth were cracked and loose — a two and one-half day's interval of time. Defense counsel properly observed that in that interval many other factors could have caused his condition: he could have bitten too hard and aggravated a pre-existing condition, for example. Without an examination of his mouth by an expert, any attempt to explain the cause of his dental condition would be speculative, especially because of the lapse of time between the nurses' actions and the report of the condition of his teeth.
 {¶ 31} This problem is highlighted by the testimony of decedent's dentist, Sikora, who testified that decedent's dental problems may have been caused by a variety of factors. He stated as follows:
 {¶ 32} Q: Did you arrive at a prognosis as far the dental health of Harry Hager on January 23rd, 2001?
 {¶ 33} * * *
 {¶ 34} A: No.
 {¶ 35} Q: Doctor, you've spoken about occlusal forces and decay and poor oral hygiene as possible explanations of the condition of Mr. Hager's teeth on January 23rd, 2001?
 {¶ 36} A: Yes.
 {¶ 37} Q: Is it fair to state that you don't know, to a reasonable degree of dental certainty, whether any of those three processes —
 {¶ 38} A: Factors.
 {¶ 39} Q: — factors were the cause of the loosened condition of his teeth as of January 23rd, 2001?
 {¶ 40} * * *
 {¶ 41} A: No.
 {¶ 42} * * *
 {¶ 43} Q: Okay.
 {¶ 44} A: And I answered no, because it could have been the possibility of the son's testimony, where the hospital loosened it, or maybe these factors where it was loosened due to decay or poor oral hygiene factors.
 {¶ 45} Sikora Deposition at p. 27.
 {¶ 46} Sikora's analysis makes the decedent's dental history and dental expertise the center of any opinion as to proximate cause. There is nothing on the record before this court establishing Martino as a qualified expert in dentistry. There is no evidence Martino had any knowledge, skill, or experience in the field of dentistry or had any knowledge of decedent's dental history. She could testify on how to remove dentures from a pre-operative patient. It was not established, however, that Martino had the necessary qualifications as a dental expert to analyze decedent's dental history in order to address proximate cause.
 {¶ 47} From this record, we conclude that the cause of decedent's dental condition is reserved to the practice of dentistry and is, therefore, outside the knowledge, skill, and expertise of a nurse.
 {¶ 48} Accordingly, we conclude that the trial court did not err in precluding Martino from offering an expert opinion on the proximate cause of decedent's dental condition.
 {¶ 49} Given the foregoing analysis, we reject plaintiff's reliance on Morris v. Children's Hospital (1991),73 Ohio App.3d 437, because that case did not address whether a nurse could opine on the issue of proximate cause. Morris addressed only the question of whether a nurse can provide expert testimony on the issue of liability, that is, whether the standard of care was breached.[2] In the instant case, no one disputes that Martino's testimony about the standard of care was acceptable. Because the relevant issue in this case is causation, Morris
does not apply.
 {¶ 50} Alternatively, plaintiff asserts that expert testimony is unnecessary where, as here, the acts of alleged negligence are within the knowledge of jurors. Plaintiff contends the removal of dentures is within the ordinary knowledge of laymen; therefore, it is unnecessary to present expert testimony that the actions of the nurses caused decedent's dental problems.
 {¶ 51} For this proposition plaintiff relies on the case ofRamage v. Central Ohio Emergency Service (1992),64 Ohio St.3d 97. We find Ramage unsupportive of plaintiff's position, however. In that case the court held as follows:
 {¶ 52} Where the alleged negligence involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury.
 {¶ 53} Id., at 103-104. Contrary to plaintiff's contention,Ramage requires expert testimony in a case such as this in which the negligence of nurses is in issue. The facts surrounding the causation question in the instant case are simply not within the ordinary knowledge of an average juror.
 {¶ 54} Sikora was decedent's dentist for many years before the events which prompted this case. He explained decedent had a history of diabetes, teeth grinding, and dental decay and that these earlier conditions could have caused the teeth to loosen and crack. In fact, a short time after Sikora first cemented decedent's fixed partial denture in his mouth, it came out and had to be recemented. Because of decedent's history before his surgery, therefore, the answer to what proximately caused decedent's dental problems is simply not within the ordinary knowledge of a lay person and, therefore, expert testimony on causation was required. Even if we construe the evidence in a light most favorable to plaintiff and conclude the nurses improperly removed decedent's dentures, we, nonetheless, cannot make the next leap plaintiff urges, namely the nurses' conduct caused decedent's problems.
 {¶ 55} Plaintiff further argues that Sikora presented expert testimony that the nurses' conduct, to a reasonable degree of dental certainty, caused decedent's dental condition in January 2001.
 {¶ 56} Even if this court takes into consideration those portions of Sikora's deposition testimony stricken by the trial court before that deposition was read to the jury, we still disagree with plaintiff's contention. In viewing the entirety of Sikora's deposition testimony, nowhere do we find any statement by him isolating the proximate cause of Mr. Hager's problems to a reasonable degree of dental certainty.
 {¶ 57} To the contrary, Sikora never reduces the poor condition of Mr. Hager's teeth to one or even two causal probabilities. His testimony, taken as a whole, attributed decedent's problems to many possible causes: decay, diabetes, occlusive force, and decedent's grinding his teeth, along with the nurses' actions.
 {¶ 58} No legitimate inference can be drawn from Sikora's testimony on which to attach liability to defendant. Whereas Sikora's testimony could be interpreted to imply that the defendant's nurses did something wrong, one can also just as easily conclude that other factors could have caused the condition of decedent's teeth after his surgery. Sikora's expert testimony does not establish to a reasonable degree of dental certainty that the defendant probably, rather than merely possibly, caused the plaintiff's injuries. In short, Sikora's testimony is merely speculative and, therefore, insufficient to establish the nurses' conduct as the proximate cause of decedent's injuries and therefore the liability of defendant.
 {¶ 59} Plaintiff's last argument is that the doctrine of res ipsa loquitur applies to the facts in this case. We disagree. In Ohio, the rule of res ipsa loquitur is "a rule of evidence which permits
 {¶ 60} the jury, but not the court in a jury trial, to draw an inference of negligence where the instrumentality causing the injury is under the exclusive management and control of one of the parties and an accident occurs under circumstances where in the ordinary course of events it would not occur when ordinary care is observed." Wise v. Timmons, 64 Ohio St.3d 113,116-117, 1992-Ohio-117, 592 N.E.2d 840 citing Glowacki v. NorthWestern Ohio Ry. Power Co. (1927), 116 Ohio St. 451,157 N.E. 21, paragraph one of the syllabus.
 {¶ 61} In the case at bar, because Sikora testified that there were many possible causes of decedent's dental problems, plaintiff is not entitled to an inference of defendant's negligence. Since Sikora could not isolate the proximate cause of decedent's poor dental condition, we cannot conclude that the "instrumentality causing the injury" was ever under defendant's exclusive control. The rule of res ipsa loquitur does not apply to the facts in this case. Given the foregoing analysis, the trial court did not err in granting defendant's motion for a directed verdict. Plaintiff's sole assignment of error is overruled.
Judgment accordingly.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kilbane, P.J., and Calabrese, JR., J., concur.
[1] At trial, Martino testified, in part, is as follows:
Q: Mrs. Martino, based upon your review of the records that you've mentioned and your many years experience as a nurse, and assuming that Harry Hager's fixed partial denture was still firmly in his upper arch prior to his being wheeled off to surgery on January 15th, 2001, and accepting as true David Hager's testimony that a nurse came to get him in the waiting room prior to the surgery, and he followed her to a holding area room where he saw one of the nurses holding his father's shoulders down while a second nurse was tugging at his father's mouth, while his father grunted and groaned, and the nurse immediately stopped tugging at his father's mouth when David exclaimed "his teeth do not come out," and also accepting as true David's telling that when he next saw his father on January 17th of 2001, his upper teeth were loose and hanging down in his mouth, do you have an opinion, based upon a reasonable degree of nursing certainty, whether the nurses who were prepping Mr. Hager for surgery on January 15th violated an applicable standard of care with regard to Harry Hager? First ever [sic] of all, do you have opinion?
A: Yes, I do.
* * *
Q: What is your opinion?
A: My opinion is that they did not appropriately evaluate if the dentures were to come out. They would have come out very gently.
Q: An so what's the standard of care for removing dentures?
A: Just to take them out very generally. They come out quite easily. They should not come out difficult. If there is a difficulty, if there's a problem you stop and evaluate.
Q: And by not stopping they violated the standard of care?
A: I think so.
Tr. 187-189, 196-198.
[2] "To prove the `liability issues' of a negligence claim, the plaintiff must establish (1) that the defendant owed a duty to the plaintiff, and (2) that the defendant failed to discharge that duty. Wise v. Doctors Hosp. North (1982),7 Ohio App.3d 331, 455 N.E.2d 1032." Id., at 440, n. 1.