JOHNSON, ADMR., APPELLANT, *v.* GRANT HOSPITAL, APPELLEE.

[Cite as Johnson v. Grant Hospital
(1972), 31 Ohio App. 2d 118.]

(No. 71-256—Decided February 8, 1972.)

*Messrs. Barkan, Barkan & Neff,* for appellant.
*Messrs. Gingher & Christensen,* for appellee.

WHITESIDE, J. This is an appeal from a judgment of the Franklin County Court of Common Pleas directing a verdict for defendant at the close of plaintiff's case.

The action below was for the wrongful death of plaintiff's decedent. Such decedent, while a patient at defendant Grant Hospital, committed suicide by jumping from a window on the ninth floor. Plaintiff's decedent was admitted as a patient to the hospital on May 27, 1968, with a provisional diagnosis of "schizophrenic reaction, schizoaffective type." This was described as an emotional disorder or as a neurosis, rather than a psychosis. While in the hospital, the decedent apparently told plaintiff, her husband, that she was contemplating suicide, and indicated that she saw him on television telling her to commit suicide. Plaintiff twice asked the nurses on duty to watch his wife closely because she was talking about committing suicide.

At approximately 9 p. m. on May 31, 1968, plaintiff's decedent was found attempting to jump out of a window of room 916 of the hospital. The nurse on duty called the decedent's doctor, who gave the following order: "Please transfer to security room. However, leave door open." At approximately 10 p. m., plaintiff's decedent left the security room, went to room 943 of the hospital and again attempted to jump out of a window. The doctor was again contacted and issued the following order: "Lock door at night."

The following morning there were fewer hospital personnel on duty than normal because it was a weekend, because of absenteeism, and because the nurse in charge was in the emergency room having a sprained ankle attended to. Plaintiff's decedent was assigned for morning care to a nurses' aide. After performing this care, the nurses' aide inquired of a nurse whether the door could be left open and was advised that it could be, but was not advised otherwise as to the patient's history. The chart contains the following entry as of 7:30 a. m.: "Door unlocked to do AM care." At approximately 8:15 a. m., plaintiff's decedent

jumped from the ninth floor solarium window to her death.

Plaintiff has made two assignments of error: (1) that the trial court erred in directing a verdict at the conclusion of plaintiff's case, and (2) that the trial court erred in excluding evidence relative to a suicide that occurred at the hospital three days before plaintiff's decedent's death. The basis upon which the trial court directed a verdict was stated as being that "reasonable minds could come to no other conclusion than that the evidence shows that the decedent was not insane, was not mentally deranged, was not mentally incompetent and that this is her voluntary act" and that "this voluntary action either was the sole proximate cause of her death or at least partially contributed to her own death."

There appears to be no Ohio case involving the issue of liability of a hospital for the suicide death of a patient. There is, however, an annotation upon the subject of civil liability for death by suicide in 11 A. L. R. 2d 751 *et seq.* Commencing at page 775, cases involving liability of hospitals for death by suicide of a patient are collected and discussed. At page 756 in the annotation, it is stated:

"Where an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable. * * *"

In discussing liability of a hospital, later, on the same page, the following statement is made:

"A different situation exists where the alleged liability for suicide is based upon the breach of a specific duty of care owed by the defendant to the person committing suicide, such as the duty of a hospital or its employees to care for a patient or inmate. In such a situation the well-settled rule is that liability exists only if the suicide proximately results from the negligence of the hospital or its employees. Such negligence is in turn held to require proof that the hospital neglected its duty of safeguarding and protecting the patient from any known or reasonably ap-

prehensible damage from himself by not exercising reasonable care. Various factors have to be taken into consideration in determining whether or not the care extended by the hospital was sufficient under the circumstances to comply with the requirement of reasonable care, the most important of them being whether or not the hospital authorities could reasonably have foreseen that the patient might harm himself."

These quotations appear reasonably to state the law in a majority of the jurisdictions.

The Supreme Court of Ohio has recognized the duty of a hospital in caring for a patient to take steps to prevent the patient from injuring himself under circumstances where the danger is apparent. See *Jones* v. *Hawkes Hospital of Mt. Carmel* (1964), 175 Ohio St. 503; and *Burks* v. *Christ Hospital* (1969), 19 Ohio St. 2d 128. The *Burks* case is similar to this case in that the hospital had apparently followed the procedure that the patient's doctor testified he wanted, but the Supreme Court held there was a jury issue because of other evidence.

The trial court was correct in his statement that the evidence shows that the decedent was not insane, was not mentally deranged, and was not mentally incompetent. However, the decedent was admitted to the hospital for treatment primarily of emotional, rather than physical, illness. Her condition was variously described as "schizophrenic reaction," "schizophrenic affective," "an emotional disorder," "disturbed," "depressed," "nervous," "delusional," and "despondent." The decedent had talked of committing suicide, and defendant's employees were advised of this. The night before her death, decedent twice attempted to jump out of windows on the ninth floor.

The mere fact that the decedent, on her third attempt, was successful in committing suicide does not render the defendant liable, since a hospital is not an insurer of its patients against injury or death inflicted by themselves. However, the hospital has a duty, in the care of its patients, to exercise such reasonable care and attention for

their safety as their known mental condition may require.

We thus find that the duty of a hospital to its patients requires a hospital to use reasonable care to prevent a patient from committing suicide if the patient's emotional and mental condition is such that a reasonably prudent person would anticipate that the patient would commit suicide unless prevented, and the hospital has knowledge of that condition.

Therefore, there are, necessarily, three issues present: (1) whether the decedent's emotional and mental condition, as known to defendant, was such that a reasonably prudent person would have anticipated that she would commit suicide at the time she did unless prevented and, if so, (2) did the defendant exercise reasonable care under the circumstances? and, if not, (3) was this failure, or negligence, on the part of the defendant, a proximate cause of the decedent's death?

Since this cause was determined by the trial court upon a motion for a directed verdict, there has been no weighing of the evidence; only an issue of law, not of fact, is involved. Pursuant to Civil Rule 50, such a motion must be overruled unless, after construing the evidence most strongly in favor of the plaintiff, reasonable minds could come to but one conclusion upon any determinative issue from the evidence submitted, and that conclusion is adverse to the plaintiff. Stated in other words, if, upon the evidence submitted, reasonable minds could differ upon the determinative issues involved, the motion should be overruled.

As to the first issue set forth above, we find that reasonable minds could differ upon the evidence. There was sufficient evidence from which the jury could reasonably conclude that the decedent's emotional and mental condition, as known to defendant, was such that a reasonably prudent person would anticipate that she would commit suicide at the time she did, if not prevented. The decedent had been locked in her room overnight, preventing her from any further suicide attempts. Whether or not a rea-

sonable person would conclude that the decedent's mental disposition had changed during her overnight stay in the locked security room presents an issue of fact, not of law. There was no direct evidence upon the question.

We likewise find that reasonable minds could differ as to the second issue set forth above. Defendant contends that this issue cannot be resolved because there is no expert-opinion evidence as to the standard of care of a hospital with relation to "suicide-prone" patients. The first and second paragraphs of the syllabus of *Jones* v. *Hawkes Hospital, supra,* read as follows:

"1. Expert-opinion evidence is not required or necessary where the subject of the inquiry is within the common, ordinary and general experience and knowledge of mankind, but such evidence is required where the inquiry pertains to a highly technical question of science or art or to a particular professional or mechanical skill.

"2. Where an expectant mother is in a labor room of the obstetrical department of a hospital, is under sedation and is extremely restless, endeavoring repeatedly to climb over the raised guardrails of her bed, and the nurse or nurses assigned to the care of such patient by the hospital leave the room and are absent for a period of from two to five minutes on a matter unrelated to the care of the patient, and during such absence of the nurse or nurses the patient falls out of her bed and is injured, expert-opinion evidence is not necessary to aid the trier of the facts to ascertain whether the conduct of the nurse or nurses constituted negligence."

The Supreme Court held, under the circumstances involved, that the issue of whether leaving a patient unattended for a period of from two to five minutes constituted negligence would appear to be for the jury.

Locking the door of the security room was merely a substitute for the observation of the patient, making such observation unnecessary. Obviously, the defendant's duty to observe a patient under the circumstances would be greater with the security room door open than it would be

with that door locked. Conversely, observation may be a reasonable care substitute for locking the door. The issue is whether the defendant was negligent in not locking the door or observing the patient under the circumstances. Reasonable minds could differ upon this issue.

Defendant contends that it cannot be negligent because it followed the doctor's order with respect to locking the door. Defendant's associate director of nursing service testified that the only rules concerning the patients in the security room were that there must be a doctor's order to place a patient in, or remove him from, the security room, that the care is under the doctor's order, and that there is a special order as follows: "Keep the door locked unless otherwise noted by the doctor, you must have orders. Otherwise, the nursing care continues the same."

The decedent's doctor testified that he anticipated that the door would be open in the morning. The nurses, however, made no effort to contact the doctor for further orders before leaving the door open, nor did they make any arrangements for the observation or supervision of decedent in view of the open door and her condition.

Under circumstances where expert testimony as to a standard of care of a hospital is unnecessary, the standard of care is not that of a reasonably prudent registered nurse, but, rather, that of a reasonably prudent person under the circumstances, whether or not specially trained. Whether a reasonably prudent person, knowing the decedent's emotional and mental condition and her two suicide attempts of the night before, would leave the decedent in an unlocked room without any provision to further observe her, even in light of the doctor's orders of the night before, would appear to us to constitute a subject within the ordinary, common and general experience and knowledge of mankind. It does not appear to be a highly technical question of science.

Even though specially trained, a nurse must also exercise the standard of care of an ordinary prudent person. Where the issue is one of an exercise of judgment or skill

requiring the specialized training of a nurse, expert opinion evidence would be required.

Even if this be a situation where expert-opinion evidence is required, there was such evidence, although conflicting. Plaintiff's exhibit A-1 is an incident report of defendant. The report of the nurse in charge of the floor upon which decedent was a patient was made four days after the suicide, and reads as follows:

"Room 947 had been locked Friday night on Dr's order to lock door at night only. The door was opened Sat. morning by a nurse aide to give the pt. AM care. The aide had Miss Beaty's permission to open door. I came back to the floor at 8 a. m. I knew the door was open, I said it would be OK to leave door open, as long as we checked the patient frequently. At 8:20 I got a call from Mrs. Nasipak, supervisor, asking me to check all of our patients to see if any are missing. We did and Mrs. Johnson from Room 947 was gone. Mrs. Overdorff got off of the elevator and told me Mrs. Johnson had jumped from the solarium window. We checked the solarium and found the window wide open, and Mrs. Johnson's slippers on the chair beside the window. I was receiving report when I got the message she had jumped. I did not know the lady or her past history or I would not have said it was OK to leave the door open; on the Kardex it said the door was to be locked at night only."

At trial, when called upon cross-examination by plaintiff, the nurse stated that she really didn't know for sure that she would not have said it was OK to leave the door open, and did not remember why she wrote that on the incident report. Later, on direct examination, she testified that leaving the door open might be in violation of the doctor's orders, but she knew of the doctor's orders when she wrote the incident report. Also, the doctor involved testified that he anticipated the door would be opened in the morning.

The nurse, however, testified that, by checking the patient frequently, she meant approximately every fif-

teen minutes. Construing the evidence most strongly for plaintiff, it appears that the door was opened at approximately 7:30, and decedent had not been checked between that time and the time of her death—approximately 8:15.

The evidence indicates that the hospital was shorthanded in its staff on the day in question. Plaintiff's decedent was assigned to the sole care of a nurses' aide who had two days' experience after two weeks' training, and who was not advised of the patient's history. The defendant took no steps with regards to the care of the decedent other than to have ''AM care'' given by the nurses' aide, and to leave the door unlocked at approximately 7:30. We find that reasonable minds could differ as to whether the defendant exercised reasonable care under the circumstances. In this regard, the trial judge stated:

''I feel that there is some evidence that could be construed as negligence on the part of the hospital, however, it is very, very thin. I don't know whether I would direct a verdict at this point in light of this small amount of evidence, and I don't have to make my conclusions on that grounds * * *.''

Likewise, we find the issue of proximate cause to be an issue upon which reasonable minds could differ upon the evidence adduced.

We, therefore, conclude that the first assignment of error is well taken in that the trial court erred in directing a verdict rather than submitting the issues to the jury. Upon such a motion, it must be borne in mind that a court cannot consider the manifest weight of the evidence, but is limited to a determination of whether reasonable minds could differ upon the *total* evidence submitted after construing such evidence most strongly in favor of the plaintiff. See *Rohde* v. *Farmer* (1970), 23 Ohio St. 2d 82. Upon such a motion, neither the trial court nor this court, upon review, is permitted to select those portions of the evidence it will consider or to weigh the evidence. When reasonable minds could differ if the evidence is construed most strongly in favor of the plaintiff, a motion for a directed verdict

must be overruled even if the court finds a judgment for plaintiff would be against the manifest weight of the evidence.

We find that the second assignment of error is not well taken. Plaintiff has not demonstrated any probative value, in this case, of evidence that there had been a prior suicide at the same hospital three days before plaintiff's decedent's death.

For the foregoing reasons, the first assignment of error is sustained, and the second assignment of error is overruled, and the judgment of the Court of Common Pleas of Franklin County is reversed, and this cause is remanded to that court for further proceedings in accordance with law consistent with this decision.

*Judgment reversed and cause remanded.*

REILLY, J., concurs.

STRAUSBAUGH, J., dissenting. The problem before us is difficult and apparently one of first impression in Ohio. I am compelled to dissent from the opinion of my esteemed colleagues and must concur in the result reached by the trial court.

An abstract of the testimony of plaintiff's witness, Dr. Jaime Smith-e-Incas, the deceased patient's attending physician, who had twenty and one-half years' training and practice in his specialty of neurology and psychiatry, should first be set forth, and is as follows:

"Q. (By Mr. Brentlinger) Doctor, does the term mentally ill lend itself to a specific mental definition that would have any application to this lady's case?

"A. In a concise concept of being mentally ill, she does not fit. She fits the emotionally disturbed category. * * * The concept of 'deranged' applies primarily to the person who we speak as a schizophrenic, a person who is mentally incompetent.

"Q. Can you say whether or not with medical certain-

ty—reasonable medical certainty that this lady was or was not mentally ill, insane or deranged at the time she took her life?

"A. She was not mentally ill, deranged or insane at the time she took her life is my concept for this reason: I had a conversation with Mrs. Johnson approximately four or five hours prior to her demise, and she was very clear, concise, rational, and went along with my recommendation for her to wait till I saw her in the morning, then we will make some changes, et cetera. I have four notes that Mrs. Johnson wrote which were written deliberately and carefully and in excellent language and thinking clear thoughts which is not the pattern of a schizophrenic or a person that is deranged. The letters she wrote were evidently why she had planned to take her life sometime that morning, whenever it was, but I am saying that the contents of these notes were so precise and in excellent language and thought plus what I have spoken to her four to five hours prior to that, in no way indicated her to be deranged.

"Q. * * * You just mentioned that you talked with her four or five hours before she took her life. How did this conversation take place? * * *

"A. This was telephone. It originated when Mrs. Johnson called me from her room. She was upset over my asking them to have her locked in for the night, and I received a call from the family, she was disturbed at my having done this, and then shortly after, Mrs. Johnson herself called me and I spoke to her at length and told her that tomorrow we will make some changes and she was quiet—her anger became subdued and we spoke rationally like we always do after we get in conversation, and I felt then that she had remained in good contact.

"Q. Did you indicate in that answer, Doctor, that members of the family had also complained about the locked door?

"A. Yes.

"Q. That evening?

"A. Yes, sir,

"Q. The question of whether or not the door would be locked, did you consider this a medical question within your control?

"A. Yes. I am so responsible for ordering whether the door is locked or not since I am in charge of the patient's care.

"Q. * * * This is a medically important decision in regard to handling this kind of patient?

"A. Yes, I think it is. The judgment of the physician if he feels his patient may be a particular problem to the nurses and personnel in the ward, or the patient may be unpredictable at a specific time, or three, if the patient is emotionally disturbed and may cause problems to the other patients on the floor, or five, if the patient himself needs to be isolated from others. There are a variety of things that go into a decision like this by the attending physician.

"Q. At the time you made that decision, doctor, were you in a position to know all of the facts and circumstances of your patient's case?

"A. Yes, I think the nurse and supervisor in charge had briefed me on the patient.

"Q. Doctor, you do have the hospital chart before you, do you not.

"A. These are the physician's orders * * *.

"Q. * * * May 31, 1968, it says, 'Lock door at night.' Was that an order you gave?

"A. Yes. That is a telephone order I gave to the nurse in charge the night of the 31st.

"Q. The order right above that says, would you read the order right above.

"A. I earlier said, 'Please transfer to security room, however, leave door open.'

"Q. So the position of the door either open or closed was a very conscious problem in your opinion?

"A. Yes, sir, in my opinion, yes, sir.

"Q. Now, the 'lock door at night,' Doctor, would you explain what that order means as far as the follow-

ing morning is concerned, whether the door was to be opened or closed.

"A. It meant that the door was to be opened in the morning at 8:00 o'clock. This is in keeping with hospital practices that activity started at 8:00 o'clock in the morning for the patient, so from 12:00 to 8:00 when we say, 'Lock at night,' is what we are speaking about.
" * * *

"Q. So if A. M. care was given at 5 minutes to 8:00, that wouldn't make it wrong under your order?

"A. No.

"Q. Or at 7:30?

"A. No.

"Q. In the course of your conversation you had with the patient, wasn't her family—the night before there was a specific reference by them, an objection, to this locked door, is that not true?

"A. Yes, sir.

"Q. And you at that time assured them that the door would be opened the next morning?

"A. That's correct.

"Q. Now, under all the circumstances, Doctor, would you expect the nurses to overrule your judgment on whether that door should be locked or unlocked?

"A. In hospital practice or medical practice the nurses only act on specific orders given by the attending physician.

"Q. Doctor, in further keeping with the open door question, permitting the door to be opened, you would anticipate that possibly the patient would walk out into the hall, would you not?

"A. Yes, sir.

"Q. This was permissible as far as you were concerned?

"A. Yes, sir.

"Q. You do not imply or tell the hospital even though the door is open, keep her in her room?

"A. No. Once we open her door, it is meant that the

patient has the freedom to walk in the aisle or walk in the corridors.

"Q. Again, Doctor, in keeping with your total knowledge and treatment of this patient, you never contemplated or ordered that the hospital stand guard over this patient as though she were being confined, did you?

"A. No.

"Q. Is it not true, Doctor, that she was in fact admitted to Grant Hospital on your service because of her physical problems, not her mental problem?

"A. Yes, sir.

"Q. In the course of your practice as a psychiatric specialist, Doctor, do you have occasion to admit patients to other than general hospitals?

"A. Yes, sir.

"Q. Where would that be?

"A. That would be Upham Hall at University or Harding Hospital or to the State Hospital or to Mt. Carmel.

"Q. Is this where you would put a patient that you considered to be deranged or insane?

"* * * *

"Q. In one of these other hospitals instead of in Grant?

"A. Yes, sir.

"Q. In your professional opinion and in your experience does Grant hold itself out as a hospital for the treatment of insane or deranged or mentally ill patients?

"A. No. The policy of Grant and the same is true of other hospitals in our area are general hospitals and it is felt that the patients who have psychiatric problems would not be admitted. Arrangements are made if necessary before admission to elsewhere. If they become disturbed within the confines of the hospital, they are transferred to a psychiatric setting.

"Q. As a matter of fact, Doctor, isn't it a well known fact within the medical profession that Grant Hospital and these other hospitals for that matter are not equipped to take care of mentally ill and insane patients?

"A. You are asking me my concept of the hospitals, they usually serve the total needs of the patient in general. They do not have facilities for the person that is deranged.
" * * *

"Q. Doctor, in your professional opinion did the Grant Hospital nursing staff follow your orders to the letter?

"A. Yes, it did.

"Q. Again in your professional opinion and based on your total knowledge of this case, did the Grant nursing staff violate any of its duties to your patient, Mrs. Johnson?

"A. No, they did not."

The problem should be broken into two parts: crisis intervention and professional treatment. The reasonably prudent person test referred to in paragraph one of the syllabus of the majority opinion should be applied to a crisis situation. An obvious example would be if a patient runs down the hall of a hospital toward an open window, yelling an intention to jump, a hospital attendant would have a duty to apprehend the patient and prevent the suicide.

However, after the crisis is over in a general hospital, and the person is under the care of an attending physician treating the person for both physical and emotional illnesses, the required standard of care becomes a medical standard requiring expert opinion to establish. In this case, at the time of the suicide and for several hours before, we find no evidence of a crisis. Such crisis had occurred and passed approximately ten hours before. The patient was under the direction of her attending physician, skilled in his neurological and psychiatric specialty. Not only was there an absence of any evidence of breach of duty on the part of the hospital and its staff, but according to the testimony of plaintiff's witness and the patient's attending physician he found that the staff followed his orders to the letter and that the staff violated no duties to his patient.

*Jones* v. *Hawkes Hospital of Mt. Carmel* (1964), 175 Ohio St. 503, is clearly distinguishable. First, it was not a suicide case. Second, the plaintiff was "restless—trying to get up to go to the bathroom" only five minutes before the plaintiff, who was "drowsy, lethargic, delirious, and restless," "apparently crawled over side rail at head of bed" injuring plaintiff. In that case, it can be said that a crisis was either in progress or five minutes away from one. There was a question whether the crisis was over. In this case, not only was there an absence of evidence of a continuing crisis, but evidence from an expert—her attending physician—that any crisis had abated four to five hours before. In *Jones,* there seems to be the implication that the average juror, from his own personal knowledge, may be able to anticipate the actions of an expectant mother, delirious, drugged, restless, and determined to climb out of bed. We might possibly feel that the actions of a person actively attempting to commit suicide could be understood and within the common knowledge of jurors, even though it could be presumed that suicides occur far less frequently than births.

The treatment and care of an emotionally disturbed person in a general hospital under the care of an attending physician, who is a specialist in that field, involves a standard of care not within the common knowledge of jurors. Jurors cannot be allowed to so speculate on the standard of care required. Here, there was not only an absence of expert testimony as to what the standard of care was and whether that standard was absent or met by the defendant, but there was affirmative evidence that the defendant followed the orders of the attending physician and violated none of its duties to the patient.

The judgment of the Common Pleas Court should be affirmed.