**JOHNSON, Admr. of the Estate of Adkins, Appellant,**

v.

**POHLMAN et al., Appellees.**

[Cite as *Johnson v. Pohlman,* 162 Ohio App.3d 240, 2005-Ohio-3554.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 85705.

Decided July 14, 2005.

Thomas E. Conway and A. Steven Dever, for appellant.

Tucker, Ellis & West, L.L.P., Irene C. Keyse–Walker, Rita A. Maimbourg, Tariq M. Naeem, and Edward E. Taber, for appellees Brad Pohlman, M.D., and the Cleveland Clinic Foundation.

Reminger & Reminger Co., L.P.A., John P. O'Neil, and James O'Connor, for appellee Lawrence Stallings, M.D.

Hanna, Campbell & Powell, Gregory T. Rossi, and Rocco D. Potenza, for appellee Margaret Kobe, M.D.

Reminger & Reminger Co., L.P.A., and Christine S. Reid, for appellees Kevin Wietecha, D.O., and Northeast Ohio Endocrinology.

———————

MICHAEL J. CORRIGAN, Judge.

{¶ 1} Paula Johnson, the executor of the estate of Paul Adkins, brought this medical-malpractice suit against several doctors involved in Adkins's medical treatment before his death. To state the case in very general terms, the estate alleged that doctors misdiagnosed Adkins with adrenal lymphoma (which is usually fatal), when in fact, he had histoplasmosis, a treatable disease. The basis of the malpractice claim is that an oncologist failed to perform a biopsy of Adkins's adrenal gland to rule out lymphoma. The estate brought suit against a number of Stark County physicians (Adkins lived in Stark County) and defendant Brad Pohlman, M.D., a physician practicing out of the Cleveland Clinic. The court eventually granted summary judgment to Pohlman and, finding Pohlman a "nominal" party, held that venue in Cuyahoga County was no longer proper and ordered the case transferred to Stark County. The court specified no just reason for delay and the estate appeals from the summary judgment.

## I

{¶ 2} As a preliminary matter, we must address a motion to dismiss the appeal that was filed by all remaining defendants. The motion argues that we lack jurisdiction to hear the appeal because an order transferring venue to another jurisdiction is not a final, appealable order under R.C. 2505.02.

{¶ 3} It is true that an order transferring a case for want of venue is not a final, appealable order. See *State ex rel. Lyons v. Zaleski* (1996), 75 Ohio St.3d 623, 625, 665 N.E.2d 212. However, the order transferring the cause is not the basis for appeal here. The estate's sole assignment of error complains of the summary judgment—no mention is made of the transfer order. There is no doubt that we have jurisdiction to hear an appeal relating to a summary

judgment rendered by a judge of the Cuyahoga County Court of Common Pleas. Indeed, no other appellate district would have jurisdiction to do so. That being the case, the motion to dismiss the appeal is denied.

## II

{¶ 4} The main issue on appeal concerns the summary judgment granted to Pohlman. In its order granting summary judgment, the court found that the issue was "whether a plaintiff in a medical malpractice action may bring a case before a jury when the plaintiff's evidence produced during discovery does not support the plaintiff's expert's report and testimony that the defendant breached a standard of care owed to the plaintiff and that breach caused an alleged injury." The court answered its own question in the negative, finding that "it is difficult to comprehend how anyone, especially a physician, could find a causal connection to Adkins' injuries" based upon Pohlman's actions.

{¶ 5} Civ.R. 56(C) permits the court to enter summary judgment when (1) no genuine issues as to any material fact remain to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come but to one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. When reviewing a motion for summary judgment, we are required to view the facts in a light most favorable to the nonmoving party. Id.

{¶ 6} In 1998, an oncologist treating Adkins made a differential diagnosis of "metastatic cancer or primary process in the adrenal glands or lymph nodes or spleen like a lymphoproliferative disorder or lymphoma." At the time, Adkins had liver disease, as well as enlarged lymph nodes, adrenal glands, and spleen. He had a persistent fever, weight loss, anemia, and a lowered white-blood-cell count. The doctor believed that he could confirm that diagnosis with a biopsy, but believed that Adkins's blood platelet count was so low that it would be prohibitively dangerous to perform it. The low platelet count meant that Adkins could have serious bleeding and become hypotensive, slipping into a coma with neurologic consequence from it. It appears that Adkins underwent biopsies of his lung and bone marrow, but they were attended by complications. By being "prohibitively dangerous" the doctor believed that "death or some other type of serious consequence or impairment" could result if Adkins underwent a biopsy. To confirm this differential diagnosis, the doctor asked Pohlman, the director of the lymphoma program at the Cleveland Clinic Cancer Center ("Clinic"), to render a second opinion.

{¶ 7} Pohlman saw Adkins and on November 30, 1998, sent the doctor the following letter:

{¶ 8} "I'm writing to summarize our phone conversation regarding Paul Adkins. As you well know, he is a 56 year-old man with a biopsy-proven micronodular cirrhosis and constitutional symptoms, retroperitoneal lymphadeno-pathy, and hepatosplenomegaly. A copy of my clinic note and our laboratory evaluation, are enclosed. As we discussed, Mr. Adkins' presentation and mono-clonal gammopathy certainly suggests the possibility of an underlying lympho-proliferative disorder. The specific diagnosis, however, will require laproscope biopsy and/or splenectomy. Unfortunately, his cirrhosis, probable portal hypo-tension, and coagulopathy make these procedures prohibitively risky. If a specific lymphoproliferative disorder e.g. lymphoma, is diagnosed, its treatment will also be difficult and potentially complicated. At this time, therefore, I can only recommend supportive care, biopsy of any easily accessible lymph node, and/or repeat bone marrow biopsy.

{¶ 9} "Thank you for the opportunity to evaluate Mr. Adkins. I'm sorry we could not be of more assistance. If you have any further questions, please feel free to contact me."

{¶ 10} At his deposition, Pohlman said that the standard of care to determine whether Adkins had a lymphoma in his adrenal gland required a biopsy. He agreed, however, with Adkins's first oncologist that a biopsy would be extremely risky given Adkins's existing physical condition. He did not know whether a platelet transfusion would have made a biopsy possible because he believed that an elevated platelet would not necessarily have increased the odds of success. Pohlman did allow that "potentially the bleeding risk would have been less with a platelet transfusion."

{¶ 11} Nevertheless, he believed that steroid therapy was the safest course of treatment. On the specific question of whether Adkins had histoplasmosis at the time he saw him, Pohlman said that he found it highly unlikely, as the steroid treatment would have acted to suppress Adkins's immune system, thus encourag-ing the spread of the disease. Since Adkins died three years after seeing Pohlman, Pohlman believed that Adkins would not have survived that long with the disease while in a state of immunosuppression.

{¶ 12} Pohlman went on to state that a biopsy would be the preferred manner in which to determine whether Adkins had a lymphoma, but that other indicators existed that very strongly suggested the presence of a lymphoma. In particular, Adkins exhibited a monoclonal protein, a potential indicator of a patient having lymphoma. Pohlman did concede that the existence of a monoclonal protein did not conclusively prove the existence of a lymphoma, as the protein can appear in healthy persons and even go away on its own.

{¶ 13} The evidence showed that Pohlman referred Adkins to a surgeon at the Clinic who advised Adkins to undergo an adrenal-gland biopsy. Adkins refused that advice, primarily because he believed from information gathered from Pohlman's letter to Stallings that the biopsy would be too dangerous. Pohlman did not learn about the surgeon's opinion regarding the safety of an adrenal-gland biopsy. Pohlman agreed that he did not follow up with the surgeon and that he would have been responsible for doing so as the primary oncological contact within the Clinic.

{¶ 14} The estate presented two experts. The first expert stated several reasons why Pohlman had violated the standard of care. He believed that the continued use of steroids was inappropriate given the lack of any definitive diagnosis of adrenal lymphoma. The expert said that there had been "probably fewer than a hundred cases ever reported in the history of the world [of] primary bilateral lymphoma," so Pohlman's differential diagnosis of adrenal lymphoma should have been suspect from the start.

{¶ 15} The expert also concluded that a biopsy of the adrenal gland would not have been as risky as presented to Adkins and that Pohlman "should have gone back to Doctor Stallings and suggested to him that he pursue more vigorously the tissue biopsies." He believed that the biopsy could have been safely performed without a platelet transfusion, and further stated that had a platelet transfusion been successful, Adkins would have faced no more than an average risk of harm. The expert read Pohlman's letter to indicate that Pohlman had not considered "supporting [Adkins] hematologically." He concluded by saying that Pohlman's breach of the standard of care "indirectly" caused Adkins's death.

{¶ 16} Another expert in infectious diseases likewise gave the opinion that Pohlman violated the applicable standard of care by failing to refer Adkins to an infectious-diseases specialist. The expert believed that the lengthy course of steroid therapy had weakened Adkins's immune system to the point where a disease other than lymphoma should have been considered, particularly with the absence of testing to specifically confirm the presence of lymphoma.

### III

{¶ 17} To maintain a wrongful-death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death. *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122, 34 O.O.2d 254, 214 N.E.2d 213, paragraph one of the syllabus. The court held that the estate failed to set forth any evidence to prove any of the elements.

## A. Duty of Care

{¶ 18} The court held that the estate had failed to offer any evidence to establish to a reasonable degree of medical certainty when or where Adkins became infected with histoplasmosis and, lacking such evidence, it would be impossible for the estate to prove that Pohlman breached a standard of care. This conclusion is erroneous because it does not include the proper standard of care: what would a reasonable physician in Pohlman's position have done under the same circumstances.

{¶ 19} The estate's claim for relief is in two interrelated parts: first, that Pohlman should have diagnosed the histoplasmosis, and second, that testing of the differential diagnosis of lymphoma would have revealed that Adkins did not have lymphoma at all, thus leading Pohlman to consider other causes and, eventually, histoplasmosis. In other words, the estate argues that Pohlman should have conducted a biopsy on Adkins's adrenal glands to determine definitively whether lymphoma existed because, as the autopsy showed, there was no lymphoma present and the doctors would have been forced to find other causes for Adkins's complaints.

{¶ 20} The evidence, viewed in a light most favorable to the estate, showed that Adkins's symptoms were arguably of a kind classically associated with lymphoma. However, one of the estate's experts said that the existence of lymphoma in the adrenal glands would be extremely rare. The inference from this expert testimony is that a reasonable oncologist would have been very cautious in concluding, without definitive testing, that Adkins had such a rare lymphoma. Pohlman himself conceded that the standard of care dictated that a diagnosis of lymphoma involving the adrenal gland would require that a tissue biopsy be taken.

{¶ 21} Pohlman ruled out a biopsy of the adrenal gland because he believed that Adkins's physical condition made the procedure too risky. He admitted, however, that a surgeon who examined Adkins two months later believed that a biopsy could go forward because Adkins's platelet count had increased. Unfortunately, Pohlman did not receive the report from the surgeon, even though he agreed that as the point man for the Clinic it was his responsibility to follow up with the surgeon. Pohlman conceded that had he consulted with the surgeon on the viability of a biopsy, he would have deferred to the surgeon's opinion on performing the biopsy.

{¶ 22} In short, reasonable minds could reach different conclusions on whether Pohlman violated the standard of care by failing to explore whether a biopsy of adrenal-gland tissue could be safely performed and failing to consult with a surgeon to whom he would have deferred.

{¶ 23} The court held that the estate failed to present any evidence that Adkins had histoplasmosis at the time Pohlman examined him; thus it ruled that

the estate could not make out its malpractice claim. As we have discussed, the claim is not entirely based on Adkins's having histoplasmosis at the time Pohlman examined him. It is based on negation—proving the existence of something by showing what it is not. Even if there was no evidence of histoplasmosis at the time, the estate could claim that Pohlman violated the standard of care by failing to confirm the differential diagnosis of lymphoma. While Pohlman did qualify his differential diagnosis by stating that more testing was required, expert testimony showed that Pohlman could have been more aggressive in seeking to prepare Adkins for a biopsy by giving him platelet transfusions.

{¶ 24} It is true, as the court pointed out, that one of the estate's experts testified that "it's more likely than not that [Adkins] had an asymptomatic episode of histoplasmosis that no one could have recognized." The expert gave this response to the question whether Adkins had "acute" histoplasmosis. The meaning of the word "acute" in this context is "short-term." The expert went on to say, however, that he believed Adkins first exhibited signs of "disseminated" histoplasmosis (that is, affecting other body parts) in September 1998, some two months before he sought out Pohlman for a second opinion. In fact, the expert went on to say that he had no question that Adkins had disseminated histoplasmosis for three years before he died. These statements were not in contradiction as they spoke to two different forms of the disease. To the extent that the expert's statements could be considered to be contradictory, Civ.R. 56(C) requires the court to resolve those differences in the estate's favor. Hence, the court erroneously concluded that the estate failed to show that Adkins had histoplasmosis at the time he was examined by Pohlman.

B. Proximate Causation

{¶ 25} To find that a breach of duty proximately caused plaintiff's injuries, it must be determined that the injury complained of is the natural and probable consequence of the negligence alleged. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287, 21 O.O.3d 177, 423 N.E.2d 467. "If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence." *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 37, 41 O.O. 117, 90 N.E.2d 859.

{¶ 26} The court granted summary judgment on the issue of proximate causation by stating:

{¶ 27} "It is difficult to comprehend how any one (*sic*), especially a physician, could find a causal connection to Adkins' injuries based upon Dr. Pohlman's guarded and conditional assessment of Adkins after a one-time visit and three years prior to his death."

{¶ 28} The court went on to say that, while the estate's experts wrote "polished reports," it was "reasonable to find as a matter of law that Dr. Pohlman provided the standard of care to a level that should be expected of him and his care and treatment of Adkins did not serve as any sort of link in a proposed chain of negligence." The court concluded that Pohlman merely provided a second opinion and that he "could not have foreseen that Adkins would go three years without a biopsy or proper follow up to the conditional assessment which Dr. Pohlman rendered, during which time Adkins would treat with numerous other physicians and was admitted as a hospital in-patient on as many as ten occasions."

{¶ 29} In short, the court ruled that Pohlman's one-time consultation with Adkins had been superseded by three succeeding years of health care by other physicians; thus, there was no causation between Pohlman's breach of the standard of care and Adkins's death.

{¶ 30} The arguments raised in this context require us to consider two different factors relating to fault-concurrent cause and superseding cause. It is well accepted that two factors can combine to produce damage or illness, each being considered a proximate cause of the injury. See *Norris v. Babcock & Wilcox Co.* (1988), 48 Ohio App.3d 66, 67, 548 N.E.2d 304. However, the causal connection between a defendant's act and the resulting damage may be broken by an intervening cause. *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.* (1995), 73 Ohio St.3d 609, 619, 653 N.E.2d 661. An intervening cause does not operate to sever the causal link if the alleged intervening cause was reasonably foreseeable by the one who is guilty of the negligence. *Neff Lumber Co. v. First Natl. Bank* (1930), 122 Ohio St. 302, 309, 171 N.E. 327.

{¶ 31} *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 6 OBR 209, 451 N.E.2d 815, paragraphs one and two of the syllabus state:

{¶ 32} "1. Whether an intervening act breaks the causal connection between negligence and injury, thus relieving one of liability for his negligence, depends upon whether that intervening cause was a conscious and responsible agency which could or should have eliminated the hazard, and whether the intervening cause was reasonably foreseeable by the one who was guilty of the negligence. (Paragraph two of the syllabus of *Thrash v. U–Drive–It Co.* [1953], 158 Ohio St. 465 [49 O.O. 402, 110 N.E.2d 419], approved and followed.)

{¶ 33} "2. Where the facts are such that reasonable minds could differ as to whether the intervening cause was a conscious and responsible agency which could or should have eliminated the hazard, whether the intervening act or cause constituted a concurrent or superseding cause, and whether the intervening cause was reasonably foreseeable by the original party guilty of negligence, present

questions for submission to a jury which generally may not be resolved by summary judgment. (*Mudrich v. Std. Oil Co.* [1950], 153 Ohio St. 31 [41 O.O. 117, 90 N.E.2d 859], approved and followed.)"

{¶ 34} The Supreme Court explained that the test for whether or not an act constitutes an intervening cause is "whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor." Id. at 160, 6 OBR 209, 451 N.E.2d 815. In this context, the word "independent" means "the absence of any connection or relationship of cause and effect between the original and subsequent act of negligence." See *Queen City Terminals, Inc.*, supra, at 620, 653 N.E.2d 661. "New" means that the second act could not have reasonably been foreseen. Id.

{¶ 35} Despite the court's reservations about finding that Pohlman's breaches of the standard of care contributed to Adkins's death, by the court's own admission, the estate presented evidence from its experts to state that Pohlman proximately caused that death. Those experts testified at deposition that Pohlman's statements to Adkins regarding the danger of a biopsy at the time of the second opinion were so compelling that Adkins thereafter refused to consider a biopsy. A family member testified that even though a surgeon told Adkins that he believed a biopsy could be safely performed, he refused the procedure based on Pohlman's warnings.

{¶ 36} Moreover, it is reasonable to infer from the evidence that successor doctors relied on Pohlman's assessment due to his reputation and expertise in treating lymphoma. Pohlman did qualify his opinion by stating that a biopsy would be the only way to confirm the diagnosis of lymphoma of the adrenal glands. But as one expert said, "there were probably fewer than a hundred cases ever reported in the history of the world [of] primary bilateral adrenal lymphoma." Given his stature within the medical community, reasonable minds could disagree on whether Pohlman should have known that his second opinion would be relied upon and thus should have been more proactive in confirming such an unusual diagnosis.

{¶ 37} As we earlier noted, the court rejected the testimony and expert reports from the estate's experts as contravening the very facts upon which they are based. Unfortunately, the court did not explain which facts were contradicted, and we are left with the impression that the court simply rejected that testimony in favor of its view of the merits of the case. This is impermissible, as it is not the court's job to weigh the credibility of the experts when ruling on a motion for summary judgment. The court could evaluate the evidence only by

giving the estate all permissible inferences and resolving questions of credibility in the estate's favor. *Dupler v. Mansfield Journal* (1980), 64 Ohio St.2d 116, 121, 18 O.O.3d 354, 413 N.E.2d 1187. The court's opinion leaves the reader with the distinct impression that it did not believe the estate's experts—but that is a matter for the trier of fact.

{¶ 38} As with any case on summary judgment, the issue is not whether the nonmoving party can prove its case to the satisfaction of a judge during motion practice. The issue is whether reasonable minds could differ on genuine issues of material fact such that they should be resolved by the trier of fact. We find that the court erred by granting summary judgment. Our holding necessarily moots the court's transfer of the case to the Stark County Court of Common Pleas and reinstates the case in the Cuyahoga County Court of Common Pleas. The assigned error is sustained.

Judgment reversed
and cause remanded.

GALLAGHER, P.J., and MCMONAGLE, J., concur.