CZARNEY, Appellant,

v.

PORTER et al., Appellees.

[Cite as *Czarney v. Porter,* 166 Ohio App.3d 830, 2006-Ohio-2471.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 86725.

Decided May 18, 2006.

Djordjevic, Casey & Meadows and James S. Casey, for appellant.

Reminger & Reminger, Christine S. Reid, David H. Krause, and Michelle J. Sheehan, for appellees.

COLLEEN CONWAY COONEY, P.J.

{¶ 1} Plaintiff-appellant, James Czarney, individually and as administrator of the estate of Ann Marie Czarney, the decedent, appeals the trial court's directed verdict in favor of defendants-appellees, Amherst Hospital Association, Inc. ("Amherst"). Finding merit to the appeal, we reverse the judgment and remand the cause for a new trial.

{¶ 2} In 2004, Czarney filed a medical-malpractice and wrongful-death complaint against Lawrence Porter, M.D., Josef K. Korinek, M.D., F.E. Yuzon, Inc., Physician's Link Center d.b.a. Emergency Medical Consultants of Lorain County, Amherst, EMH Regional Healthcare System, and the Hospital for Orthopedics and Specialty Services.[1] The action arises from the medical treatment that the decedent received while under the care of the named defendants. The matter proceeded to a jury trial at which the trial court granted Amherst's motion for directed verdict following the close of Czarney's case. The court concluded that Czarney had failed to present expert testimony that Amherst's nurses were negligent other than Molly Anders, and any alleged negligence of Anders was superseded by the negligence of Dr. Korinek.

{¶ 3} Czarney appeals the court's decision, raising two assignments of error.

## Standard of Review

{¶ 4} The applicable standard of review for a directed verdict is set forth in Civ.R. 50(A)(4), which provides:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 5} "A motion for a directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." *Texler v. D.O. Summers Cleaners* (1998), 81 Ohio St.3d 677, 679–680, 693 N.E.2d 271, citing *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68–69, 23 O.O.3d 115, 430 N.E.2d 935, 938. In deciding the merits of a motion for directed verdict, the trial court does not weigh the evidence or evaluate the credibility of witnesses. Id. Instead, the court construes

---

1. All parties except Amherst and the Hospital for Orthopedics and Specialty Services were dismissed prior to or during trial. Counsel conceded at argument that the Hospital for Orthopedics and Specialty Services is a part of Amherst.

the evidence in a light most favorable to the party opposing the motion, and "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." (Citations omitted.) *Texler*, 81 Ohio St.3d at 679, 693 N.E.2d 271.

## Intervening/Superseding Event

{¶ 6} In his first assignment of error, Czarney argues that the trial court erred in dismissing the case based upon the law of superseding/intervening causes.

{¶ 7} It is well accepted that two factors can combine to produce damage or illness, each being considered a proximate cause of the injury. *Johnson v. Pohlman*, 162 Ohio App.3d 240, 249, 2005-Ohio-3554, 833 N.E.2d 313, citing *Norris v. Babcock & Wilcox Co.* (1988), 48 Ohio App.3d 66, 548 N.E.2d 304. However, the causal connection between one defendant's act and the resulting damage may be broken by an intervening cause. *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.* (1995), 73 Ohio St.3d 609, 619, 653 N.E.2d 661.

> The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. "Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury." *Garbe v. Halloran* (1948), 150 Ohio St. 476, 38 O.O. 325, 83 N.E.2d 217, paragraph one of the syllabus.

*Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 584, 613 N.E.2d 1014.

{¶ 8} A break in the chain of causation must occur in order to relieve a party of liability. This break will occur when another conscious, responsible agency that could or should have eliminated the hazard intervenes in an agency creating a hazard and an injury resulting therefrom. *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 323, 58 O.O. 119, 130 N.E.2d 824, paragraph one of the syllabus; *Thrash v. U–Drive–It Co.* (1953), 158 Ohio St. 465, 49 O.O. 402, 110 N.E.2d 419, paragraph two of the syllabus. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury. *Berdyck*, 66 Ohio St.3d at 585, 613 N.E.2d 1014. Typically, the issue of intervening causation presents factual issues to be decided by the trier of fact. *Heise v. Orra* (Feb. 23,

1995), Cuyahoga App. No. 66172, 1995 WL 79794, citing *Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 269, 617 N.E.2d 1068.

{¶ 9} The Ohio Supreme Court explained that the test for whether an act constitutes an intervening cause is "whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor." *Johnson*, 162 Ohio App.3d at 250, 833 N.E.2d 313, citing *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 160, 6 OBR 209, 451 N.E.2d 815. "Independent" means "the absence of any connection or relationship of cause and effect between the original and subsequent act of negligence," and "new" means that the second act could not have reasonably been foreseen. *Queen City Terminals, Inc.*, 73 Ohio St.3d at 620, 653 N.E.2d 661. Therefore, to be an intervening act, Dr. Korinek's actions must have been both independent and new.

{¶ 10} In granting Amherst's directed verdict on this ground, the court found only that Dr. Korinek's actions were new, i.e., unforeseeable. However, the court made no conclusion as to whether his actions were independent. We hold that reasonable minds could reach different conclusions regarding whether Dr. Korinek's actions were causally connected to Anders's actions or were independent. The issue revolves around the infusion rate by which the decedent received a blood transfusion.

{¶ 11} The decedent was admitted to Amherst the afternoon of December 16, 2003, for treatment of a gastrointestinal bleed. Dr. Porter, the decedent's emergency-room physician, testified that at 4:30 p.m., Dr. Korinek ordered that the decedent receive a blood transfusion and that she be monitored by a telemetry unit. During this conversation, Dr. Korinek did not specify an infusion rate. Dr. Porter testified that no rate was indicated because the blood was not ready for infusion, stating, "I was going to give a rate when I got the blood. I was going to order the rate when the blood was given to me." According to Porter, it is the doctor's responsibility to set the rate, and he would expect the nurse to ask him about the rate once the blood was presented for infusion.

{¶ 12} Nurse Anders testified that at 6:30 p.m., she received various admitting orders over the phone from Dr. Korinek, pertaining to the decedent's care. Dr. Korinek ordered a transfusion of two units of packed red blood cells; he also ordered that the decedent be connected to a telemetry monitor and that fluids be administered. Nurse Anders testified that Dr. Korinek did not specify an infusion rate for the blood transfusion. According to Anders, when physicians at Amherst order a blood transfusion and fail to specify a rate, they generally want it infused between 100 and 125 milliliters per hour. Because of this routine and standard practice, she testified, "Dr. Korinek wanted me to run it at 125 when he

doesn't specify a rate." It is undisputed that Anders unilaterally set the infusion rate at 125. According to Dr. Porter, he would have ordered the blood to run "wide open," and not at a rate of 125.[2] He further testified that none of the nurses asked him for an infusion rate.

{¶ 13} It is also undisputed that pursuant to the EMH Nursing Department procedures and policies, "[i]t is the physician's responsibility to order the infusion rate or hang time" when administering a blood transfusion. This is the only written policy regarding infusion rates. Nevertheless, Elaine Jones, an Amherst nursing supervisor, testified that these policies are more like "guidelines," and critical thinking and judgment are expected to be used by the nurses when needed. According to Jones, the physician sets the infusion rate pursuant to the policy; however, an acceptable and recognized rate would be 125 if there were no circumstances indicated by the doctor requiring a different rate.

{¶ 14} Dr. Korinek testified that he ordered that the decedent receive two units of blood "now." He testified that he did not specify a rate because the infusion rate could be limited by the location of the IV in the patient. He stated that when a patient is hypotensive, as was the decedent, a "wide open" infusion rate is typical. He further testified that when a patient has a gastrointestinal bleed, the rule is to infuse blood "wide open." He further testified that when he gave Anders the orders at 6:30 p.m., she did not inform him of the decedent's blood pressure or that the decedent had received three liters of fluid.

{¶ 15} When Dr. Korinek arrived at Amherst later that evening and checked on the decedent, he found her to be alert and oriented. He testified that he did not review any blood transfusion paperwork but assumed that the blood was running as fast as possible, although he never checked the infusion rate. He further testified that based on the information provided by the nurses, he did not change the infusion rate because he assumed it was running "wide open." According to Dr. Korinek, he did not check the patient's chart because he relied on the nurses to tell him if the patient was unstable. He further assumed that the decedent was being monitored by a telemetry unit as he had ordered, although he did not check the monitor when he made his rounds. Korinek did not dispute that he deviated from the standard of care in treating the decedent.

{¶ 16} Dr. Raymond Rozman provided expert testimony in which he opined that both Korinek and Anders deviated from the standard of care. He was critical of the infusion rate that Anders set because it was too low, based on the patient's condition, and he stated that it was her duty to ask the doctor about the appropriate infusion rate when no rate was given to her. According to Dr.

---

2. Dr. Porter testified that "wide open" means to hang the blood or fluid as fast as the IV tubing allows it to go into the patient.

Rozman, had Dr. Korinek changed the infusion rate at 8:30 p.m., the decedent would have survived. Additionally, an expert witness, Dr. Aaron Chevinsky, testified that the infusion rate set by Anders caused the decedent's death.

{¶ 17} In ruling on a motion for a directed verdict, credibility and weight of the evidence cannot be considered. Based on our review of the testimony presented at trial, we hold that the court erred in granting Amherst's motion for a directed verdict. Viewing the evidence in the light most favorable to the nonmoving party, reasonable minds could reach different conclusions as to whether Dr. Korinek's actions were independent of Anders's actions.

{¶ 18} The evidence shows that Anders did not follow the written policy and procedures in setting the infusion rate because she did not ask a physician to set the rate. Instead, she unilaterally set the rate according to what she believed Dr. Korinek would routinely choose. The evidence also shows that Dr. Korinek did not specify an infusion rate when he gave the orders to Anders, nor did he review the infusion rate when he checked on the decedent at the hospital.

{¶ 19} The Supreme Court of Ohio has concluded that "the intervening negligence of an attending physician does not absolve a hospital of its prior negligence if both co-operated in proximately causing an injury to the patient and no break occurred in the chain of causation between the hospital's negligence and the resulting injury." *Berdyck*, 66 Ohio St.3d 573, 613 N.E.2d 1014, paragraph six of the syllabus. Accordingly, reasonable minds could reach different conclusions as to whether the actions of Anders and Dr. Korinek are causally connected or independent.

{¶ 20} Amherst argues that Dr. Korinek had an independent duty to examine the decedent when he arrived at the hospital. It further argues that Anders did not place Dr. Korinek in a position to be negligent; rather, it was Dr. Korinek who placed himself in that position by failing to specify an infusion rate and then failing to correct the infusion rate when he checked on the decedent that evening. Although we agree that Dr. Korinek had an independent duty to the decedent, the question is not whether there was an independent duty, but whether Dr. Korinek's act or omission independently caused the injury and death. Based on the testimony presented, reasonable minds could differ on this issue. Although Dr. Rozman testified that the decedent's death would not have occurred had Dr. Korinek changed the infusion rate, Dr. Aaron Chevinsky testified that the same would have been true had Anders set the infusion rate according to written policy and procedures. These are issues that should have been submitted to the trier of fact.

{¶ 21} Therefore, irrespective of any unforeseeable actions by Dr. Korinek, in order for him to be an intervening cause, his actions must be both independent

and new. Because we find that reasonable minds could reach different conclusions as to whether his actions were independent, the court erred in directing a verdict in favor of Amherst on this issue.

{¶ 22} Accordingly, Czarney's first assignment of error is sustained.

## Nursing Standard of Care

{¶ 23} In his second assignment of error, Czarney argues that the trial court erred in excluding argument and evidence of the Amherst nurses' failure to follow the orders of the treating physicians. The trial court granted Amherst's motion for directed verdict on any and all arguments of any factual issues other than the inappropriate infusion rate set by Anders because no expert testimony was presented to support the other alleged negligent actions by Amherst and its employees.

{¶ 24} It is well settled that expert testimony is necessary to establish the prevailing standard of care where the professional skills and judgment of a nurse are alleged to be deficient. *Sullins v. Univ. Hosps.*, Cuyahoga App. No. 80444, 2003-Ohio-398, 2003 WL 195076.

{¶ 25} "Where the issue is one of an exercise of judgment or skill requiring the specialized training of a nurse, expert-opinion evidence would be required." *Johnson v. Grant Hosp.* (1972), 31 Ohio App.2d 118, 124–125, 60 O.O.2d 202, 286 N.E.2d 308, reversed on other grounds (1972), 32 Ohio St.2d 169, 291 N.E.2d 440.

{¶ 26} Under the doctrine of respondeat superior, a hospital is liable for the negligent acts of its employees. *Klema v. St. Elizabeth's Hosp. of Youngstown* (1960), 170 Ohio St. 519, 11 O.O.2d 326, 166 N.E.2d 765, paragraph two of the syllabus. "In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph one of the syllabus. However, expert testimony is not required in a negligence action involving conduct within the common knowledge and experience of jurors. Id.

{¶ 27} Czarney argues that expert testimony was not required on all issues in this case because the conduct of Amherst's employees was within the common knowledge and experience of the jurors. We agree.

{¶ 28} Expert testimony was presented regarding transfusion procedures and rate. In fact, Amherst's counsel agreed at trial that expert testimony was presented on this issue. The court also made a specific finding that this issue was the only issue to survive Amherst's directed-verdict motion.

{¶ 29} Nevertheless, evidence was presented that Amherst employees had failed to follow physician orders regarding the administration of fluids and placing the decedent on a telemetry monitor.

{¶ 30} Dr. Korinek testified that his admitting orders required blood and fluid to be run together; however, Amherst's nurses did not run them at the same time. Both Dr. Korinek and Dr. Porter testified that an order was placed for the decedent to be monitored by a telemetry monitor, yet no evidence existed that such a monitor was ever connected to the decedent. Dr. Korinek testified that Amherst's nurses failed to fully inform him as to the decedent's condition.

{¶ 31} Dr. Korinek and the expert witnesses testified that these failures were of dire consequence to the decedent. Dr. Korinek further testified that he would have acted differently had he been fully informed about the decedent's condition. Numerous expert witnesses testified that the telemetry monitor would have alerted the nurses to any change in the decedent's condition before she suffered cardiac arrest.

{¶ 32} We agree that the discontinuation and administration of fluids is outside the realm of the knowledge and experience of average jurors, but the concept of following orders is not. When a physician gives an order and it is not followed by a nurse or the medical staff, expert testimony may not be required to explain that this may be negligent. The evidence in the instant case is clear that Dr. Korinek ordered that the decedent be monitored by a telemetry unit; however, there is no evidence of compliance with this order.

{¶ 33} A nurse's failure to follow a physician's order is within the common knowledge and experience of jurors. Therefore, expert testimony was not required to show that the nursing staff may have been negligent in failing to follow physician orders. However, it is the jury's responsibility to weigh the evidence and credibility of the witnesses and ultimately decide whether these failures contributed to or caused the injury.

{¶ 34} Therefore, the trial court erred in granting Amherst's directed verdict on other alleged negligent actions by Amherst's nurses.

{¶ 35} Accordingly, Czarney's second assignment of error is sustained.

Judgment reversed
and cause remanded.

GALLAGHER and ROCCO, JJ., concur.