[Cite as *Vestige, Ltd. v. Mills*, 2013-Ohio-2379.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

VESTIGE, LTD.

    Appellee

    v.

LUTHER MILLS, ESQ.

    Appellant

C.A. No.      12CA0041-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     09CIV0529

DECISION AND JOURNAL ENTRY

Dated: June 10, 2013

---

CARR, Presiding Judge.

{¶1}    Appellant, Luther Mills, dba The Mills Law Office, appeals from a judgment of the Medina County Court of Common Pleas that awarded damages and attorney fees to appellee, Vestige, Ltd., on its breach of contract claim against Mills. This Court reverses and remands for a new trial because the trial court erred in granting a directed verdict against Mills on his counterclaim, which alleged that Vestige was not entitled to payment under the contract because it breached its duty to perform its services in professional and competent manner.

I.

{¶2}    Because the dispositive issue in this appeal is the directed verdict granted against Mills on his counterclaim, this Court has construed the evidence in favor of Mills, and states the facts in that light.[1]  On July 15, 2008, Mills, an attorney, entered into a contractual relationship

---

[1] Despite the representations in Vestige's appellate brief to the contrary, a transcript of proceedings was filed and made part of the record in this appeal.

with Vestige, a computer forensic company, to examine computer evidence that the State had seized from the home of one of his clients. Mills had been retained by Danny Starner to defend him against criminal charges in Marion County involving the alleged sexual abuse of minors. As part of the State's investigation in that case, it seized several computers, external drives, and other computer-related devices from Starner's home. The computers and devices were searched for evidence that would corroborate the statements of one or more of the alleged victims that Starner had stored images of his victims on the computers and that he had shown one victim pornographic images and/or "stories" on a computer in his kitchen.

{¶3} During discovery in Starner's criminal case, the prosecution provided the defense with extensive information about what the Bureau of Criminal Investigation ("BCI") had recovered from Starner's computers. According to Mills, BCI initially discovered little or no incriminating evidence on Starner's computers but later was able to determine that a software program, Evidence Eliminator, had been run on one or more of the computers to delete numerous files. Although BCI was unable to recover the content of the deleted files, the prosecution planned to use the results of BCI's forensic analysis as circumstantial evidence of Starner's guilt, based on an inference that he had deleted the files because they were incriminating.

{¶4} Mills contracted with Vestige to conduct an independent forensic examination of the evidence seized from Starner's home, explain the results of its analysis to Mills and his defense team and, if Mills concluded that independent expert testimony would aid Starner's defense, Vestige would provide an expert to testify at Starner's trial. It was understood between the parties that Starner's defense team hired Vestige to help it understand what the prosecution could prove about the operation of the Evidence Eliminator program on Starner's computers.

{¶5} Vestige analyst, Nick Ventura, conducted the bulk of the forensic analysis of the numerous computers and other devices that had been seized from Starner's home. Ventura did not have experience testifying as an expert witness at trial, however. Consequently, Mills and Vestige agreed that, if the defense team decided to present expert testimony at Starner's trial, that testimony would be provided by a more experienced Vestige analyst, Greg Kelley. Because Kelley had testified as a trial expert approximately 20 times before, Mills believed he would be qualified to handle cross-examination by the prosecution.

{¶6} On October 15, 2008, several days before Starner's criminal trial commenced, Mills and other members of Starner's defense team met with Kelley and Ventura. The purpose of the meeting was to discuss Vestige's forensic analysis of Starner's computers to enable Mills to plan the defense strategy. During the meeting, Kelley and Ventura informed the defense team about what Ventura had found on Starner's computers and led them to believe that the prosecution would not be able to prove that Starner had operated the Evidence Eliminator program to delete incriminating files from his computers. Based on what Mills learned from Vestige at the meeting, he decided that the defense would present Kelley as an expert witness at Starner's trial because his testimony would be helpful to the defense. Because Ventura had performed most of the forensic work, however, Mills asked him to attend the trial as well, to assist the defense team in preparing its cross-examination of the BCI expert.

{¶7} Unbeknownst to Mills, Ventura came to Starner's trial with written notes about the results of his computer forensic analysis. Aside from problems created by the fact that the trial court considered Ventura's notes to be a written expert witness report that Mills had not provided to the prosecution, portions of Ventura's written notes contradicted some of Kelley's testimony and/or what he had communicated to the defense team about the results of Vestige's

forensic analysis. The prosecution cross-examined Kelley with Ventura's notes and admitted them as an exhibit at trial.

{¶8} Ultimately, the overall substance of the Vestige expert evidence at Starner's trial was different from what Kelley had communicated to the defense team about the content of the deleted files, what specific computers and drives showed evidence of file deletion, and whether Starner had deliberately deleted files. Mills believed that Kelley's expert testimony was damaging to Starner's defense and, according to Mills and another member of the defense team, Kelley apologized to Mills after his testimony. After the trial, Mills took the position that, had Kelley accurately informed him about the results of Vestige's forensic analysis, he would not have presented his expert testimony at Starner's trial.

{¶9} By the conclusion of its services, Vestige billed Mills a total of over $30,000 for its time and expenses. Included in its bill, Vestige charged its hourly rate of $250 for each of the hours that Ventura and Kelley spent at Starner's trial, for a total of $12,000 – 15,000. Although Mills had already paid $15,000 of the bill through several retainer payments, he refused to pay the remaining balance of the bill. Consequently, Vestige sued Mills, seeking to recover the remaining balance that it alleged was due on the contract. Mills counterclaimed, alleging that he owed Vestige nothing, and in fact might be entitled to a refund of what he had already paid, because Vestige breached the contract by negligently performing its services.

{¶10} This civil matter proceeded to a jury trial. Following the presentation of evidence, Vestige moved for a directed verdict on the counterclaim, arguing that Mills could not prove that Vestige breached its duty to perform its obligations under the contract because Mills failed to offer expert testimony on the issue of its professional duty. The trial court agreed and granted a directed verdict on Mills' counterclaim. The jury found in favor of Vestige on its

breach of contract claim and awarded damages of $15,928.48 plus interest. The trial court entered judgment on the jury verdict.

{¶11} Vestige also sought attorney fees pursuant to paragraph 11 of the parties' agreement, which provided, in relevant part:

> In the event legal action is commenced by either party in connection with this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs * * * expended by the prevailing party in connection with such action.

After the damage judgment in its favor, Vestige moved the trial court for an award of attorney fees. Following a hearing on the issue, the trial court awarded Vestige $16,890.00 in attorney fees. Mills appeals and raises two assignments of error.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN DECIDING THAT AN EXPERT WITNESS WAS REQUIRED IN ORDER FOR DEFENDANT TO PURSUE HIS COUNTERCLAIM.

{¶12} Mills' first assignment of error challenges the directed verdict on his counterclaim. The trial court dismissed his counterclaim because Mills did not present the testimony of a forensic expert to support his claim that Vestige failed to perform its services under the contract in a reasonably professional manner. Mills argues that the alleged breach of duty by Vestige was within the common understanding of a lay person and, therefore, did not require expert testimony to establish his claim. We agree.

{¶13} Expert testimony may have been required if Mills had attempted to prove that Ventura or anyone else from Vestige had failed to exercise reasonable skill or judgment in analyzing the contents of Starner's computers. *See, e.g.*, *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 102 (1992). "Generally, expert testimony would be required in

regard to professional standards of performance." *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 113 (1984).

**{¶14}** Mills' counterclaim did not allege any deficiencies in the quality of forensic analysis that Ventura performed on the computer evidence seized from Starner's home, however. The gist of Mills' counterclaim was that, even if Vestige performed a competent forensic evaluation of Starner's computers, it did not accurately and/or effectively communicate the results of its analysis to Mills and other members of the defense team. Mills focused on evidence that Kelley, who did most of the communication to the defense team about Ventura's findings, and later testified as an expert, lacked sufficient knowledge about the results of Ventura's forensic analysis. The sole focus of the counterclaim was on Vestige's breach of its duty to adequately communicate its forensic findings to Mills to enable him to plan his trial strategy in Starner's defense and, if Mills chose to present forensic evidence at trial, to provide him with an expert who was reasonably prepared to testify about the results of Vestige's forensic analysis.

**{¶15}** In his legal representation of Starner, rather than relying on BCI's assessment of the computer evidence, Mills hired Vestige to determine, and explain to his defense team, what the prosecution could prove from the computer evidence, and whether BCI's forensic assessment of Starner's computers was accurate or could be challenged through cross-examination and/or independent expert testimony. *See* Greeley, *The Plight of Indigent Defendants in A Computer-Based Age: Maintaining the Adversarial System by Granting Indigent Defendants Access to Computer Experts*, 16 Va. J.L. & Tech. 400, 407-09 (2011). A criminal defense attorney's reliance on an independent expert requires that the expert accurately and effectively communicate the results of its assessment to the defense attorneys to enable them to exercise their professional judgment in planning trial strategy. *See id.* Vestige's communication of its

forensic results to the defense team was a key element of the professional relationship between Mills and Vestige.

{¶16}  The contract between Mills and Vestige explicitly provided, in relevant part, that "Vestige Ltd. will examine all available evidence in the case, provide an analysis of its findings, and will be available to provide testimony in the manner."  The component of the contract that required Vestige to "provide an analysis of its findings" required that it communicate its findings to Mills and implicitly required that it do so accurately and effectively.

{¶17}  The professional negligence counterclaim of Mills involved only "matters of common knowledge and experience, [that] are within the ordinary, common and general knowledge and experience of mankind, [and] need not be established by expert opinion testimony."  *Ramage,* at 103.   The obligation of an expert consultant to communicate to his client, in terms that someone outside his field of expertise can understand, and to do so in an accurate manner, falls within the common knowledge that average jurors have.  Any lay person could understand that Vestige had a duty to provide Mills and his team with an accurate explanation of its findings, and, if asked to provide expert testimony, to provide an expert who was adequately familiar with the results of Vestige's forensic analysis and prepared to testify at trial.

{¶18}  At the October 15 meeting, Vestige reported its results to the defense team and the team asked specific questions about the operation of the Evidence Eliminator program on Starner's computers.  Mills and other members of his defense team testified at the civil trial about significant discrepancies between what Kelley explained to them at the pretrial meeting and his testimony at Starner's criminal trial.  Mills presented evidence that there were three key areas of discrepancies, all of which focused on the extent to which the prosecution could create

an inference that Starner had taken deliberate action to delete incriminating evidence from his computers: whether the files had been deleted automatically or manually; the specific computers from which files had been deleted; and the content of the deleted files.

<u>Automatic vs. Manual Deletion of the Files</u>

{¶19}  Vestige informed the defense team that the Evidence Eliminator program had the ability to delete files automatically and manually, so the defense team asked numerous questions about the manner in which the relevant files had been deleted from Starner's computers.  The defense team questioned Vestige at length about whether the prosecution could prove that the files had been deleted manually (by a key stroke or some other deliberate action by a person) and, if so, whether it could prove that Starner himself had deleted the files.  According to the testimony of Mills and another member of his defense team, Kelley told them that the relevant files had been deleted by an automatic operation of the program, not by manual operation.

{¶20}  At Starner's trial, however, Kelley testified that Evidence Eliminator did not automatically delete files from any of the computers but that it was operated by a person at the keyboard every time the program deleted files.  Kelley was then cross-examined about the contents of Ventura's notes, which indicated that Evidence Eliminator had been operated from Starner's personal user's account.

{¶21}  At the civil trial, Mills' witnesses testified that this was a major discrepancy between the pre-trial information provided by Kelley and his actual testimony.  Rather than assisting in Starner's defense, the defendant's own expert only bolstered the State's argument that Starner had deliberately deleted files from his computers.

Specific Computers with Deleted Files

{¶22}  Numerous computers had been seized from Starner's home, but a significant part of the prosecution's case focused on the computer in Starner's kitchen.  Consequently, the defense team explained the significance of the kitchen computer to Kelley and asked him several times which computers and drives had run the Evidence Eliminator program to delete files.  According to the testimony of Mills' witnesses, Kelley told them that the program had been run on only one computer seized from Starner's home, which was not the computer in the kitchen.  A member of the defense team further testified that they specifically asked whether the Evidence Eliminator program had been run on the detachable USB drive that was found in Starner's kitchen.  Kelley told them that Evidence Eliminator had not been run on the USB drive.  At trial, however, Kelley testified that Evidence Eliminator had deleted files on two computers, including the one found in the kitchen, and that it had been used to delete files from the USB drive.

Content of Deleted Files

{¶23}  The defense team further asked Kelley about whether the prosecution could prove the type of files that were deleted from Starner's computers, with specific focus on pornographic or any type of images or pictures.  They repeatedly asked for confirmation that the prosecution would not be able to prove that pictures or photographs had been deleted from Starner's computers.  According to Mills' witnesses, Kelly told them that only one picture had been deleted and that the other files were text files.  At Starner's criminal trial, however, Kelley testified that "anything" could have been in the files that were deleted.

{¶24}  Ultimately, given the numerous discrepancies between Kelley's actual testimony and what the defense team had expected it to be, Mills believed that Kelley's testimony did more harm than good to Starner's defense.  As Mills explained at the civil trial, he gave his client bad

legal advice based on bad information. He further testified that, had Vestige accurately and effectively informed him about the results of its forensic analysis, he would not have called Kelley as an expert witness at Starner's trial and might even have advised Starner to enter into plea negotiations rather than going to trial.

{¶25} The sole reason that Mills contracted with Vestige was to assist him in his criminal defense of Starner by helping him understand the State's evidence against his client. Apparently because Kelley did not fully understand the results of Ventura's forensic analysis or did not effectively communicate those results, he had misinformed Mills and the defense team about the incriminating nature of the evidence found on Starner's computers. Construing the facts in favor of Mills at the civil trial, a reasonable juror could understand and conclude that Vestige breached its duty to Mills to accurately and effectively communicate the results of its forensic analysis to assist him in planning his trial strategy and to provide him with an expert witness who was adequately informed about the results of the forensic analysis. No expert testimony was required to explain the standard of care owed by Vestige under these facts, because it was well within the common understanding of a reasonable juror that the duty of a forensic expert to communicate its findings to a client implies a duty to communicate those findings in an accurate and effective manner. Because Mills presented evidence to support his counterclaim and no expert testimony was required, the trial court erred in granting a directed verdict against him. The first assignment of error is sustained.

## ASSIGNMENT OF ERROR II

THE COURT ERRED IN GRANTING ATTORNEY FEES BASED [ON] PARAGRAPH 11 OF THE CONTRACT DATED JULY 15, 2008.

**{¶26}** Mills' second assignment of error, which challenges the trial court's award of attorney fees to Vestige, will not be addressed on the merits because it has been rendered moot by this Court's disposition of the first assignment of error.

III.

**{¶27}** The first assignment of error is sustained. The second assignment of error was not addressed because it is moot. Because this Court is remanding the matter to allow the counterclaim of Mills to be decided on the merits, Vestige's damage claim must necessarily be re-litigated because Vestige's claim for payment was inextricably intertwined with Mills' counterclaim. Consequently, Vestige's damage award, its status as the "prevailing party," and its subsequent award of attorney fees are reversed and remanded for further proceedings consistent with this opinion.

Judgment reversed<br>and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
DONNA J. CARR
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

STEWART ROBERTS and STACY MILLS, Attorneys at Law, for Appellant.

RONALD T. GATTS, Attorney at Law, for Appellee.